REVISED, March 25, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-10809
_____

JOHNNY DEAN PYLES,

Petitioner-Appellant,

v.

Gary L JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

March 5, 1998

Before KING, HIGGINBOTHAM, and DAVIS, Circuit Judges.

KING, Circuit Judge:

Petitioner-appellant Johnny Dean Pyles, a Texas death row
inmate convicted of capital murder, appeals the district court's
denial of his petition for a writ of habeas corpus. For the
reasons set forth below, we affirm.

## I.  FACTUAL BACKGROUND

While on routine patrol at 12:50 a.m. on June 20, 1982,
Officer Charles Mitchell, a deputy sheriff with the Dallas County
Sheriff's Department, noticed a beige Jeep in the parking lot of
a small convenience store in the city of Sunnyvale. The store
was closed. Mitchell used his patrol car's spotlight to examine

the vehicle and the store as he slowly drove past. Mitchell did not see anyone, but a couple in an automobile flashed their high beams as he drove away, and Mitchell stopped. After a conversation with the couple, Mitchell called for backup and indicated that a white male suspected of criminal activity was in the area of the convenience store. Mitchell then parked behind the Jeep with his high beams and spotlight on the vehicle. Mitchell exited his patrol car and, using a flashlight, inspected all four sides of the convenience store building in search of the suspect. Mitchell did not see anyone and concluded that the store was secure.

Officers Ray Kovar and Dwaine Crain, responding to Mitchell's request for backup, approached the scene with their emergency lights and siren on, but turned them off when they got within one half to three quarters of a mile of the store. Mitchell heard the backup unit's siren before the officers turned them off. Kovar and Crain arrived at the scene at approximately 1:00 a.m. After the three officers again secured the building, they began a search of the area.

Mitchell saw Kovar walk around the east side of the building, with a flashlight in his left hand and his pistol in his right hand. Crain took a shotgun and went to the west side of the building to search there. Mitchell and Crain both heard Kovar tell someone, "Halt, get up." Then a series of gunshots were fired. Mitchell ran to help Kovar and found him lying face

2

down.  Kovar had suffered a bullet wound to the chest from which he later died.

Crain heard Mitchell shout that Kovar was down and called in a report to that effect on his radio to his dispatcher before joining Mitchell.  Crain noticed that Kovar's flashlight was turned on.  Two police officers unsuccessfully attempted to resuscitate Kovar, and several others searched the scene of the shooting but were unable to locate a suspect.

Richard Hart, a reserve deputy sheriff who was called out to assist in the search for the person who killed Officer Kovar, set up surveillance in an unmarked car almost two miles from the scene of the shooting.  Around 4:00 a.m., Hart saw a white male, later identified as Johnny Dean Pyles, walking toward him on Collins Road.  He immediately radioed a description of Pyles to the dispatcher and then left the car, pointing his flashlight and pistol at Pyles and ordering him to halt.  At first, Pyles turned around and took several steps back the way he came.  Hart again ordered Pyles to stop, saying, "One more step and that's it." Pyles turned around and raised his hands.  He told Hart that he was not armed.  Hart ordered Pyles to lie face down on the road. He noticed that Pyles's right hand was swollen, and that he was bloody and covered with mud.  Hart handcuffed Pyles and placed him in the back seat of the car lying face down.  Hart recited Pyles's Miranda warnings on the way to the Sunnyvale Substation, and Pyles indicated that he understood his rights.

3

The magistrate again read Pyles his rights and advised him that he was being charged with capital murder, a crime punishable by life imprisonment or death.  The magistrate asked Pyles if he was in pain and if he wanted to go to the hospital.  Pyles did not ask for medical attention and did not complain of being in pain.  After a paramedic bandaged and elevated Pyles's arm, the magistrate asked Pyles if he was up to talking to the police.[1]  Pyles responded affirmatively and the magistrate left for a brief period.

The magistrate returned as Pyles was preparing to sign a statement admitting that he had shot Officer Kovar.  The magistrate informed Pyles that he did not have to sign the statement, and, according to the magistrate, Pyles replied, "I might as well, Judge.  I did it."  Pyles then signed the statement with his left hand.

Afterward, Sergeant Larry Williams of the Dallas County Sheriff's Office interrogated Pyles.  A second statement was prepared based on the conversation between Pyles and Williams, and Pyles signed that statement.

At Pyles's capital murder trial, the medical examiner testified that the cause of Officer Kovar's death was a gunshot

---

[1]  In his brief, Pyles states, without record citation, that he received no medical attention until after he provided the police with a confession.  However, the Texas Court of Criminal Appeals found that Pyles received the above-described medical treatment prior to signing statements containing his confessions.  Pyles does not challenge this factual finding or its entitlement to a presumption of correctness pursuant to 28 U.S.C. § 2254(d) (1994).

wound to his chest. A .38 caliber bullet was removed from Kovar's body. An officer from the Physical Evidence Section of the Sheriff's Office testified about the scene of the shooting. He explained that a .357 magnum pistol was found where Officer Kovar fell. The weapon contained six spent casings. A .38 caliber pistol, found twenty-seven feet from Kovar, contained four spent casings and one empty chamber. Both weapons had been completely emptied by firing.

Pyles testified on his own behalf, explaining that he was not aware at the time of the shooting that Kovar was a police officer. Pyles claimed that he acted in self-defense, firing because he saw a flashlight and a gun pointed at him and heard a voice telling him to halt.

## II. PROCEDURAL BACKGROUND

On October 14, 1982, Pyles was convicted of capital murder after a seven-week jury trial. On October 15, 1982, after a separate punishment hearing, the jury answered the three special issues presented to them pursuant to the version of article 37.071 of the Texas Code of Criminal Procedure in effect at the time of Pyles's trial in the affirmative. The state district court later sentenced Pyles to death. The Texas Court of Criminal Appeals affirmed Pyles's conviction and sentence on June 1, 1988.

Pyles filed an application for writ of habeas corpus in state district court on December 5, 1990. On July 15, 1991, the district court entered an order adopting the proposed findings of

5

fact and conclusions of law set forth in the state's response and recommending that the application be denied. On July 19, 1991, the Texas Court of Criminal Appeals accepted the district court's recommendation and denied Pyles's application.

On July 22, 1991, Pyles filed a petition for writ of habeas corpus in federal district court. An evidentiary hearing was held before a magistrate judge on January 24 and 25, 1996. On January 16, 1997, the magistrate judge entered findings and a recommendation that the petition be denied. After a de novo review, the district court adopted the magistrate's recommendation and denied Pyles's petition on June 16, 1997. This appeal follows.[2]

### III. ANALYSIS

Pyles contends that the district court erred in denying his petition for a writ of habeas corpus because (1) his conviction was based in part upon extrinsic evidence obtained as a result of

---

[2] The district court granted Pyles a certificate of appealability (COA) on August 18, 1997. Prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, a habeas petitioner was required to obtain a certificate of probable cause (CPC) in order to appeal the district court's denial of his habeas petition. See 28 U.S.C. § 2253 (1994). The AEDPA eliminates the CPC requirement of 28 U.S.C. § 2253 and substitutes a requirement that a petitioner seeking review of a district court's denial of a petition for federal habeas relief under 28 U.S.C. § 2254 obtain a COA from a circuit judge. Because Pyles filed his habeas petition before the AEDPA's effective date, he must obtain a CPC rather than a COA. See United States v. Roberts, 118 F.3d 1071, 1072 (5th Cir. 1997). We therefore construe the district court's COA as a CPC. See Cannon v. Johnson, ___ F.3d ___, ___, No. 96-50934, 1998 WL 37087, at *2 (5th Cir. Jan 30, 1998). "Thus, [Pyles] does not need further certification from a circuit judge before we can hear the merits of his appeal." Id.

6

a juror's unauthorized visit to the crime scene, (2) the state knowingly presented false testimony at his trial, and (3) the state withheld exculpatory evidence. We address each of these issues in turn.

## A. Juror Misconduct

Pyles contends that his conviction was tainted by juror misconduct because one of the jurors in his case, Geraldine Sarratt, made an unauthorized visit to the crime scene. In support of his claim, Pyles offers two affidavits from Sarratt.[3] Both affidavits state that, during the guilt/innocence phase of Pyles's trial, Sarratt made an unauthorized visit to the scene of the shooting. According to the second affidavit, she made the visit during daylight hours. The affidavits also state that, based on the evidence presented at trial, which included photographs of the crime scene taken during day and night, Sarratt "was not convinced that Johnny was guilty of capital murder."

---

[3] Pyles presented only the first of the two affidavits to the state courts in connection with his state habeas proceeding. Citing Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), the state argues that this court is prohibited from considering the second affidavit because Pyles has made no showing of cause for his failure to present the second affidavit to the state court and prejudice resulting from our refusal to consider it. Pyles responds that the state has waived this issue of evidentiary default by failing to object at the district court level to consideration of the second affidavit. As explained, infra, only a portion of each affidavit is competent summary judgment evidence because each contains statements that are inadmissible under Rule 606(b) of the Federal Rules of Evidence. Because we conclude that Pyles is not entitled to habeas relief even if we consider the admissible portions of both affidavits, we need not address this issue.

Each affidavit contains a description of the manner in which Sarratt perceived the actual crime scene, viewed in person, to differ from the photographs of the crime scene presented at trial. The first affidavit states:

> Because I had questions in my mind, I went to the scene of the crime. The lot was much smaller than I pictured from the trial. Although photos were in evidence with officers testifying about the scene, pictures never tell the whole story. The visit to the scene of the crime helped me decide that if there had been a police car and officers in the lot, that anyone hiding in the lot would have known a police officer was present.

The second affidavit states:

> During the trial, while I was sitting on the jury of Mr. Pyles' capital murder trial and prior to his conviction, I went to the exact scene of the crime. I went to the scene because the photographs and diagrams presented at trial were inadequate for me to understand the dimensions of the area. Most, if not all, of the photographs introduced during the trial were taken of the building and the lot at night. I went to the scene during the day light hours. At that time, I was able to clearly see the dimensions of the area where the crime occurred. The dimensions of the scene in person were very different than the photographs and diagrams shown to the jury during trial.
>
> Specifically, the lot was much smaller than the photographs and diagrams indicated at trial. Viewing the area in person, I was able to see that Mr. Pyles and the victim were much closer in proximity to each [other] than any of the photographs and diagrams shown to the jury had indicated. My visit to the scene of the crime surprised me because it looked so much different to me than the photographs and diagrams in evidence. It was only after viewing the crime scene for myself, in person, that I decided that if there had been a police car and police officers in the lot, that anyone hiding in the lot would have known a police officer was present.

As the district court observed, a substantial portion of Sarratt's affidavits are inadmissible as evidence under Rule

8

606(b) of the Federal Rules of Evidence.[4]  Rule 606(b) bars juror

testimony regarding the following four topics:

> (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.

United States v. Ortiz, 942 F.2d 903, 913 (5th Cir. 1991).

However, the rule provides that "a juror may testify on the

question whether extraneous prejudicial information was

improperly brought to the jury's attention or whether any outside

influence was improperly brought to bear upon any juror."  FED.

R. EVID. 606(b); see also United States v. Ruggiero, 56 F.3d 647,

652 (5th Cir. 1995); Ortiz, 942 F.2d at 913.  We have interpreted

this portion of Rule 606(b) as follows:

> Post-verdict inquiries into the existence of impermissible extraneous influences on a jury's

---

[4]  Rule 606(b) provides as follows:

Inquiry into validity of verdict or indictment.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

FED. R. EVID. 606(b).

> deliberations are allowed under appropriate circumstances so that a jury-man may testify to any facts bearing upon the question of the <u>existence</u> of any extraneous influence, although not as to how far that influence operated upon his mind.

<u>Llewellyn v. Stynchcombe</u>, 609 F.2d 194, 196 (5th Cir. 1980) (citations and internal quotation marks omitted).  Put another way, under Rule 606(b), "the district court is precluded from investigating the subjective effects of any [allegedly prejudicial extrinsic matter] on any jurors."  <u>United States v. Howard</u>, 506 F.2d 865, 869 (5th Cir. 1975).

Pyles concedes that those portions of Sarratt's affidavits indicating that the evidence at trial failed to convince her that Pyles knew that Kovar was a police officer when he shot him but that she was convinced that this was the case after visiting the scene of the crime are inadmissible under Rule 606(b).  He contends, however, that Sarratt's statements that "[t]he lot was much smaller than [she] pictured from the trial" and that the scene "looked so much different to [her] than the photographs and diagrams in evidence" are admissible for purposes of evaluating his claim of juror misconduct.  These statements by Sarratt are not merely descriptive of the outside influence brought to bear upon her while she served as a juror in Pyles's trial.  Rather, they describe her impression of that outside influence as compared to the evidence adduced at trial.  Specifically, these statements relate to the mental picture of the crime scene that Sarratt drew from the evidence presented at trial and the impact that her visit to the crime scene had on that mental picture.

10

Therefore, Sarratt's statements regarding the manner in which she perceived the crime scene viewed in person to differ from the image of the crime scene that emerged from the evidence presented at trial can have no bearing on our evaluation of Pyles's claim because such statements constitute impermissible testimony regarding a juror's "mental processes." FED. R. EVID. 606(b). We may consider only those portions of Sarratt's affidavits which indicate that Sarratt visited the crime scene during daylight hours. We turn now to the issue of whether Sarratt's alleged visit to the crime scene entitles Pyles to habeas relief.

The Sixth Amendment right to a trial by jury, enforceable against the states as a result of incorporation through the Fourteenth Amendment's due process clause, see Duncan v. Louisiana, 391 U.S. 145, 149 (1968), "implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Turner v. Louisiana, 379 U.S. 466, 472-73 (1965). Sarratt's unauthorized visit to the crime scene therefore constituted constitutional error. The next step of our inquiry is a determination of whether Pyles is entitled to habeas relief based on this constitutional error.

Pyles contends that Sarratt's unauthorized visit to the crime scene entitles him to habeas relief unless the state proves that no reasonable probability exists that Sarratt's visit influenced the jury. In support of this contention, he relies

11

upon <u>Remmer v. United States</u>, 347 U.S. 227 (1954), a case that involved a federal criminal defendant's claim on direct appeal that the jury improperly considered information acquired extrajudicially in reaching its verdict. In contrast, Pyles's claim is before us in the context of a collateral attack on a state conviction and sentence. We conclude that interests in comity and federalism, as well as "the State's interest in the finality of convictions that have survived direct review within the state court system," mandate that we apply a more deferential standard of review in evaluating Pyles's claim. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 635 (1993). Specifically, we hold that Pyles's claim is subject to harmless error analysis and that, because the claim is presented as a collateral attack on a final state conviction, Pyles is not entitled to habeas relief on the claim unless Sarratt's unauthorized visit to the crime scene "'had a substantial and injurious effect or influence in determining the jury's verdict.'" <u>Id.</u> at 623 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). Before turning to the analytical justification for this legal conclusion, we note that, in drawing the conclusion that we have, we join three other circuits that have addressed the appropriate standard of review in evaluating a habeas petitioner's claim that the jury improperly considered extrinsic material evidence in reaching its verdict. <u>See</u> <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1489 (9th Cir. 1997) (applying the <u>Brecht</u> harmless error standard in evaluating a habeas petitioner's Sixth Amendment claim based on a juror's

12

disclosure of information regarding the petitioner's criminal history to other members of the jury); Sherman v. Smith, 89 F.3d 1134, 1137-42 (4th Cir. 1996) (holding that a juror's unauthorized inspection of a tree in which the petitioner allegedly hid the murder weapon did not warrant habeas relief because it did not have a substantial and injurious effect in determining the jury's verdict); Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994) (concluding that the petitioner was entitled to relief on his claim that the jury considered extra-record information in reaching its verdict only if the petitioner demonstrated that the error had a substantial and injurious effect or influence in determining the jury's verdict).

In determining whether a constitutional error is subject to harmless error analysis, the Supreme Court has drawn a distinction between "trial error" and "structural error." Trial error is error that "'occur[s] during the presentation of the case to the jury.'" Brecht, 507 U.S. at 629 (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)) (brackets in original). Such error "is amenable to harmless error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" Id. (quoting Fulminante, 499 U.S. at 307-08) (ellipses and brackets in original). "Structural error" is error "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." Fulminante,

13

499 U.S. at 310.  By its very nature, structural error "def[ies] analysis by 'harmless-error' standards."  Id. at 309.

Pyles contends that Sarratt's unauthorized visit to the crime scene constituted structural error and is therefore not subject to review for harmless error.  We reject this contention and conclude that the unauthorized visit to the crime scene by Sarratt is error of a type that is subject to harmless error analysis.

Pyles first argues that, because Sarratt's visit to the crime scene did not "occur during the presentation of the case to the jury," it does not fit the Supreme Court's definition of trial error[5] and therefore is not amenable to harmless error analysis.  Pyles's argument rests upon an oversimplified conception of the Supreme Court's inquiry into the amenability of particular constitutional error to harmless error analysis.  In Brecht, the Court described a "spectrum of constitutional errors," with trial errors--errors amenable to harmless error analysis--at one pole and structural errors--errors that are not amenable to harmless error analysis and therefore "require[] automatic reversal of the  conviction because they infect the entire trial process"--at the other.  Brecht, 507 U.S. at 629-30; see also Cupit v. Whitley, 28 F.3d 532, 538 (5th Cir. 1994)

_____

[5]  Sarratt's second affidavit states that she went to the crime scene "during the trial, while [she] was sitting on the jury of Mr. Pyles' capital murder trial and prior to his conviction."  We assume arguendo that Sarratt's visit to the crime scene does not fit the Supreme Court's definition of trial error.

14

(acknowledging the possible existence of "'hybrid,' or 'unusual' cases that do not fit so neatly into one of [the] two primary categories of error"). We conclude that the constitutional error at issue here rests quite near the "trial error" end of the spectrum because the impact of Sarratt's unauthorized visit to the crime scene "'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" Id. at 629 (quoting Fulminante, 499 U.S. at 307-08). That is, it is possible for us to quantitatively evaluate what impact the additional information, if any, that Sarratt acquired from the visit to the crime scene had on the jury's conviction of Pyles in light of the evidence presented at trial regarding Pyles's knowledge that he was shooting a police officer.

Pyles next argues that, "[b]ecause Mr. Pyles' counsel was not present when Mrs. Sarratt visited the scene, Mr. Pyles was absolutely denied the assistance of counsel." Pyles notes that the complete denial of the assistance of counsel constitutes structural error, and that the error in this case was structural because it was tantamount to a deprivation of the assistance of counsel. See Fulminante, 499 U.S. at 309 (observing that "the total deprivation of the right to counsel at trial" constitutes structural error). While it is clear that Sarratt's unauthorized visit to the crime scene implicated Pyles's Sixth Amendment rights to counsel, confrontation, and trial by an impartial jury, Pyles's contention that this constitutional error constituted a

15

complete denial of his right to counsel is sheer hyperbole. To conclude otherwise would, for example, necessarily imply that the erroneous admission of hearsay into evidence constitutes structural error because the general rule against the admission of hearsay rests on the protection of many of the same constitutional interests at issue here. See Ecker v. Scott, 69 F.3d 69, 71 (5th Cir. 1995). Generally speaking, when hearsay testimony is offered into evidence, the defendant's attorney will not have been present when the declarant made the out-of-court statement at issue and will have had no opportunity to cross-examine the declarant on the statement when it was made. Yet, we have held that the erroneous admission of hearsay evidence is amenable to harmless error analysis. See Cupit, 28 F.3d at 538. We see no reason to reach a different result in evaluating Pyles's claim of juror misconduct.

We also note that Pyles's contention that the juror misconduct at issue here is structural error that does not lend itself to harmless error analysis is inconsistent with his position that he is entitled to habeas relief unless the state proves that no reasonable possibility exists that the unauthorized visit influenced the jury. As noted earlier, this is the standard applicable in determining whether a criminal defendant is entitled to a new trial on direct appeal based upon the jury's consideration of extrinsic information. See Ruggiero, 56 F.3d at 652 ("[I]t is well-settled that a defendant is entitled to a new trial when extrinsic evidence is introduced

16

into the jury room unless there is no reasonable possibility that the jury's verdict was influenced by the material that improperly came before it." (internal quotation marks omitted)).  This standard is in essence another way of stating the standard for harmless error review established in Chapman v. California, 386 U.S. 18 (1967).

In Chapman, the Court held that, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  Id. at 24.  In adopting this rule, the Court relied heavily upon its previous decision in Fahy v. Connecticut, 375 U.S. 85 (1963).  In Fahy, the Court concluded that the petitioner was entitled to a new trial on the basis of the erroneous admission of unconstitutionally obtained evidence at his criminal trial because "there [was] a reasonable possibility that the evidence complained of might have contributed to the conviction." Id. at 86-87.  The Chapman Court observed that

> [t]here is little, if any, difference between our statement in Fahy v. Connecticut about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.

Chapman, 386 U.S. at 24; see also Lowery v. Collins, 988 F.2d 1364, 1367 (5th Cir. 1993) (observing that, under the Chapman standard, "a defendant convicted on the basis of constitutionally inadmissible evidence is entitled to a new trial unless the error 'was harmless beyond a reasonable doubt'--i.e., that there [wa]s

17

[no] reasonable possibility that the evidence complained of might have contributed to the conviction" (brackets in original) (footnote omitted)).

Thus, in arguing that he is entitled to habeas relief unless the state proves that no reasonable possibility exists that Sarratt's unauthorized visit to the crime scene influenced the jury, Pyles implicitly concedes that the constitutional error at issue here is subject to harmless error analysis because the standard that he asks us to apply is in essence a different way of articulating the Chapman harmless error standard. Pyles in effect asks us to conduct a harmless error analysis of the constitutional error at issue here, albeit under an incorrect standard.

In Brecht, the Supreme Court held that the Chapman harmless error standard is inapplicable in evaluating constitutional claims presented on collateral review. See Brecht, 507 U.S. at 623. As noted earlier, the Court went on to hold that a constitutional trial error warrants habeas relief only if it "had a substantial and injurious effect or influence in determining the jury's verdict." Id. at 623 (internal quotation marks omitted). We therefore proceed to a determination of whether the unauthorized crime scene visit at issue here had such an effect

18

or influence in determining the jury's verdict.[6]  We conclude

that it did not.[7]

Pyles contends that Sarratt's visit to the crime scene had a

substantial and injurious effect on the jury's verdict "[b]ecause

the only real dispute at trial was whether Pyles knew [Kovar] was

a peace officer at the time he shot."  Pyles's capital murder

conviction depended upon proof that he knew he was shooting a

peace officer.  See TEX. PEN. CODE ANN. § 19.03(a)(1) (providing

that a person commits capital murder if "the person murders a

_____

[6]  Pyles also argues that Brecht's more deferential harmless error standard presupposes that the state court reviewing the claim in the first instance applied the Chapman standard and concluded that any constitutional error was harmless beyond a reasonable doubt.  He therefore argues that we should apply Chapman's less exacting harmless error standard in this case because, in evaluating his juror misconduct claim, the state court did not indicate that it found Sarratt's crime scene visit harmless beyond a reasonable doubt.  We recently rejected this same argument in Hoque v. Johnson, 131 F.3d 466, 498-99 (5th Cir. 1997), and therefore reject it here as well.

[7]  Pyles contends that we should remand the case to the district court so that it may apply the proper standard of review.  However, the district court evaluated Pyles's claim under the standard that he suggests and determined that no reasonable possibility existed that Sarratt's visit of the crime scene influenced the jury's verdict.  The district court would necessarily reject Pyles's claim under the "less onerous" harmless error standard that we hold is applicable in evaluating it.  Brecht, 507 U.S. at 623.  Remand would therefore serve no purpose.

Pyles also contends that remand is warranted because the state contests whether Sarratt ever actually made the visit she claims to have made in her affidavit.  Because the state is unwilling to concede that Sarratt made the unauthorized visit to the crime scene, Pyles contends that genuine issues of material fact exist regarding his claim of juror misconduct.  However, whether Sarratt made the unauthorized visit to the scene is immaterial because we conclude that, even if she made the visit as she claims, Pyles is nonetheless not entitled to habeas relief.  Remand is therefore not warranted on this basis either.

19

peace officer . . . who is acting in the lawful discharge of an official duty and who the person knows is a peace officer"). Pyles therefore argues that "the physical characteristics of the scene were of primary importance in reaching a verdict."  While we agree that the physical characteristics of the scene were of importance in determining whether Pyles knew that he was shooting a peace officer, we disagree with Pyles's contention that this fact alone leads inexorably to a conclusion that Sarratt's visit to the crime scene had a substantial and injurious effect in determining the jury's verdict.  A great deal of evidence regarding the physical characteristics of the crime scene was admitted at trial.  The state introduced nineteen photographs of the crime scene, including photographs taken during daytime and nighttime.  Pyles himself testified that the photographs admitted at trial were accurate representations of the scene.  Second, the state admitted a detailed diagram of the lot where the shooting took place that included the dimensions of the area.[8]  A number of witnesses testified about the crime scene, using the diagram to aid their testimony.  The jury thus heard and saw a great deal of evidence regarding the physical characteristics of the crime scene at trial.

Furthermore, while evidence of the physical characteristics of the crime scene was doubtless important to the jury's

---

[8]  Many of these photographs and diagrams were not included in the record on appeal.  However, Pyles does not contest that the photographs depicted the crime scene during daytime and nighttime.  He also does not dispute that the diagram of the lot accurately reflected the scene's dimensions.

determination of whether Pyles knew he was shooting a peace officer, it was certainly not the only type of evidence germane to this determination. The record contains a large amount of other evidence indicating that Pyles knew that he was shooting a police officer. Perhaps most important in this regard is Pyles's first confession, which included the statement, "I didn't see the person I shot, but I knew it had to be a police officer."[9] Pyles's "own confession [was] probably the most probative and damaging evidence that [could] be admitted against him." Bruton v. United States, 391 U.S. 123, 139 (1968) (White, J., dissenting). Furthermore, Pyles testified that he saw the lights of a vehicle behind his Jeep. Officer Collins testified that he was in his police uniform on the night of the shooting and that, before Kovar and Crain arrived, he inspected all four sides of the building with a flashlight to determine whether it was secure. This provides strongly probative evidence that Pyles, who testified that he was hiding behind the building prior to the shooting, knew that police officers were on the scene. Additionally, Collins testified that he could hear the sirens of Kovar and Crain's patrol car as it approached, though they turned off the lights and sirens before reaching the scene.

---

[9] Pyles's opening brief contains no claim that this confession was involuntary, nor did he challenge its admissibility on any other grounds. His reply brief contains a footnote in which he attempts to challenge the voluntariness of his confession. However, because he failed to raise the issue in his opening brief, Pyles has waived any challenge to the voluntariness of his confession. See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal.").

In sum, given the sizeable amount of evidence regarding the physical characteristics of the crime scene, including daytime photographs of the area, we conclude that Sarratt's daytime visit to the crime scene was largely duplicative of the evidence presented at trial. Furthermore, the record contains a great deal of evidence unrelated to the physical characteristics of the crime scene that constitutes powerful proof that Pyles knew he was shooting a peace officer. We therefore conclude that Sarratt's unauthorized visit to the crime scene did not "ha[ve] substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623 (internal quotation marks omitted). The district court therefore properly denied Pyles's request for habeas relief on this claim.

### B. Knowing Presentation of Perjured Testimony

Pyles contends that the prosecution knowingly presented false testimony during his trial. "A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected." Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir.) (citing Napue v. Illinois, 360 U.S. 264 (1959)), cert. denied, 117 S. Ct. 487 (1996). To obtain a reversal based upon a prosecutor's use of perjured testimony or failure to correct such testimony, a habeas petitioner must demonstrate that "1) the testimony was actually false, 2) the state knew it was false and 3) the testimony was material." See id.; Blackmon v. Scott, 22 F.3d 560, 565 (5th Cir. 1994).

22

During Pyles's trial, Gary LaCour and Robert Banschenbach, two former cellmates of Pyles, testified as witnesses for the state. LaCour testified that Pyles told him that, on the night of the shooting, "he was trying to burglarize a store and that he saw a police car pull up." Banschenbach testified that he asked Pyles "did you know that it was a copy [sic] you were shooting at?" and that Pyles responded "Yeah, I knew who he was."

During its cross-examination of Pyles, the state offered evidence that the phrases, "Kill All Whie [sic] Pig Ploice [sic]" and "Kill Kill Judge DA," were scratched into the walls of Pyles's jail cell. Pyles claimed that the phrases were on the cell wall before his arrival. LaCour testified as a rebuttal witness that he saw Pyles scratching an "L" into one of the phrases. Pyles contends that this testimony was false and that the state knew that it was false before offering it.

The magistrate judge held an evidentiary hearing on Pyles's claim that the prosecution knowingly presented false testimony. The magistrate judge concluded that LaCour and Banschenbach testified falsely at Pyles's trial based upon their invocation of their Fifth Amendment privilege against self-incrimination when asked to answer questions relating to the veracity of their trial testimony.[10] However, the magistrate judge went on to determine

---

[10] Prior to the evidentiary hearing, LaCour informed the magistrate judge that he intended to invoke his Fifth Amendment privilege against self-incrimination in response to any questions about his trial testimony or prior discussions with law enforcement authorities. Both parties agreed that it was unnecessary for LaCour to appear in court for this purpose. The magistrate judge therefore quashed the writ of habeas corpus ad

23

that he was "unable to conclude that the prosecutors knew Banschenbach and LaCour were lying." The magistrate therefore recommended that the district court deny relief on Pyles's claim that the prosecution knowingly offered false testimony, and the district court accepted the recommendation.

Pyles acknowledges that we must accept factual determinations, such as the magistrate judge's conclusion that the prosecutors did not know that Banschenbach and LaCour were lying, unless they are clearly erroneous. See Washington v. Johnson, 90 F.3d 945, 951 (5th Cir. 1996). However, he contends that, at the evidentiary hearing, he offered evidence that conclusively established that the prosecution knew that the testimony of Banschenbach and LaCour was false prior to presenting it. He points to the fact that, when asked at the evidentiary hearing, "Did you give . . . the District Attorneys . . . any indication that any part of your testimony was inaccurate?" Banschenbach invoked his Fifth Amendment privilege. Pyles argues that Banschenbach's invocation of the privilege was proper only if Banschenbach's truthful answer to the question would have been affirmative because this is the only answer that would have indicated that Banschenbach actually lied at trial.[11]

_____

testificandum previously issued to LaCour.

[11] Strictly speaking, it is not the case that an affirmative answer to this question would have implied that Banschenbach lied at trial. Banschenbach could have given the prosecutors reason to believe that some of his testimony was inaccurate in a way that would not necessarily imply that he was lying. For example, Banschenbach could have told prosecutors that he did not have a good memory or that his recollection was

24

Pyles argues that a truthful negative answer to the question would have merely indicated that Banschenbach gave the prosecutors no reason to believe that his testimony was false. This could be the case either (1) because Banschenbach's trial testimony was truthful or (2) because Banschenbach is a good liar. Therefore, Pyles argues that the magistrate should have inferred from Banschenbach's invocation of the privilege that Banschenbach had in fact given the prosecution a reason to believe that his testimony was false.

We have held that "[t]he Fifth Amendment 'does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" FDIC v. Fidelity & Deposit Co. of Maryland, 45 F.3d 969, 977 (5th Cir. 1995) (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)). The same is true regarding an invocation of the privilege by a non-party witness in a civil action. See id. However, the fact that the Fifth Amendment does not prohibit such inferences does not imply that the fact-finder is required to make them. Moreover, even if the magistrate were required to conclude by implication that Banschenbach would have testified that he "gave the district attorney some indication that . . . part of his testimony was inaccurate," the magistrate judge was free to make a negative credibility assessment regarding Banschenbach's implied testimony. See Orduna S.A. v. Zen-Noh

_____

hazy regarding certain details surrounding his interaction with Pyles.

25

Grain Corp., 913 F.2d 1149, 1154 (5th Cir. 1990) ("The credibility determination of witnesses . . . is peculiarly within the province of the district court.").

Pyles also offered an affidavit from LaCour, which states that his "entire testimony was untrue and the state knew it." The magistrate judge declined to consider this statement in LaCour's affidavit because it was hearsay. Pyles contends that the portion of LaCour's statement indicating that the state knew that his testimony was false is admissible under Rule 804(b)(3) of the Federal Rules of Evidence as a statement against interest. He argues that the statement potentially subjected LaCour to civil liability under 42 U.S.C. § 1983. Given that Pyles cites no authority in support of this proposition, we cannot say that the district court abused its discretion in concluding that the statement was not so against LaCour's interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." FED. R. EVID. 804(b)(3).[12]

---

[12] Pyles also contends that the prosecutors knew that LaCour's statement that he saw Pyles scratching the incriminating phrases into the wall of his cell was false because they had received a statement from Scottie Cetnar, another cellmate of Pyles, stating that Pyles did not scratch the phrases on the wall. Cetnar stated that the phrases were on the wall before he moved into the cell block. However, the state points out that Pyles was transferred to the cell block on August 10, 1982, LaCour was transferred to the cell block on August 16, 1982, and Cetnar was transferred to the cell block on August 26, 1982. Pyles does not dispute the accuracy of these transfer dates. Thus, the state observes that, because LaCour never specified the date on which he saw Pyles scratching the comments into his cell wall, it is possible that Pyles scratched the phrases into the wall any time between August 16 and 26, 1982.

26

Pyles also points to the fact that, at the evidentiary hearing, Winfield Scott, one of the prosecutors involved in Pyles's trial, testified that he had formed a "suspicion" that the phrases were "probably written by some non-white semi-literate" because some of the phrases contained misspellings and had racial overtones. Scott also provided the following testimony regarding the veracity of LaCour's testimony:

> [T]o this day I don't know whether [LaCour's] testimony is true or false. My only concern was how is it going to impact the jury. I certainly had no, you know, no way of knowing whether his testimony to this day is true or false.

Pyles contends that this testimony indicates that the prosecution did "not s[eek] out information readily available to it" regarding the truth or falsity of LaCour and Banschenbach's testimony. United States v. Auten, 632 F.2d 478, 481 (5th Cir. Unit A 1980). However, Pyles provides no indication of what information revealing the falsity of LaCour and Banschenbach's testimony was "readily available" to the prosecution.[13]

On this record, we cannot say that the magistrate judge clearly erred in concluding that the prosecution did not knowingly present false testimony from LaCour and Banschenbach. The district court therefore properly denied Pyles's request for habeas relief on this claim.

---

[13] It is worth noting that Scott also testified that he wished to have a polygraph performed on LaCour, but was informed that the results would be unreliable because of LaCour's history of drug use.

## C. Withholding Exculpatory Evidence

Pyles finally contends that the government withheld exculpatory evidence regarding LaCour and Banschenbach's history as informants and regarding assistance that the state provided LaCour in exchange for his testimony. "The prosecution's suppression of evidence favorable to the accused violates the Due Process Clause if the evidence is material either to guilt or to punishment." Kopycinski v. Scott, 64 F.3d 223, 225 (5th Cir. 1995) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). This includes evidence that may be used to impeach a witness's credibility. See id. (citing United States v. Bagley, 473 U.S. 667, 676 (1985)). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682; see also Kopycinski, 64 F.3d at 225-26. If the prosecution withholds evidence that satisfies the above definition of materiality, then harmless error analysis is inapposite and habeas relief is warranted. See Kyles v. Whitley, 514 U.S. 419, 435 (1995). This is so because,

> [a]ssuming, arguendo, that a harmless-error enquiry were to apply, a Bagley error could not be treated as harmless, since a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict.

Id. (internal quotation marks and citations omitted).

Pyles first claims that the state failed to disclose the fact that prosecutors had promised LaCour that they would

28

recommend two-year concurrent sentences for his pending burglary convictions.  At trial, LaCour testified that the prosecution had agreed to request that his state sentences run concurrently with the federal time that he would be serving as a result of revocation of his federal probation.  LaCour testified that he was hoping that he would at least get a deal whereby he would be paroled from state prison as soon as he finished serving his federal sentence, which could have continued for another four years, but that the prosecution had made no specific promise.  Several months after Pyles's trial, Gerald Banks, the lead prosecutor, recommended that LaCour receive concurrent two-year sentences on his pending burglary charges.  At the federal evidentiary hearing, Banks testified that he had not withheld any portion of the deal that he had negotiated with LaCour in exchange for his testimony.[14]

The magistrate judge concluded that the state had not withheld any information regarding any promises made to LaCour prior to trial, and we cannot say that this factual finding is clearly erroneous.  None of the evidence presented at the evidentiary hearing establishes that the state had promised LaCour that it would recommend concurrent two-year sentences on

---

[14]  As noted before, Pyles offered LaCour's affidavit as evidence at the evidentiary hearing.  The affidavit states that prosecutors had promised LaCour prior to Pyles's trial that they would recommend concurrent two-year sentences on his pending burglary convictions.  However, it appears that the magistrate judge did not consider this portion of the affidavit because it was not inconsistent with LaCour's trial testimony and therefore did not constitute a statement against interest.  See FED. R. EVID. 804(b)(3).

his burglary charges prior to Pyles's trial. Moreover, even if the state had withheld evidence regarding such a promise, such evidence was immaterial. During cross-examination by Pyles's counsel, LaCour did not mince words in indicating that self-interest motivated his testimony:

> Q: Well, you saw a chance, after you talked to Johnny Pyles and learned that he was tried for capital murder of a police officer, you saw a chance to help yourself out with your problems with the law?
>
> A: Yes, sir.
>
>    . . .
>
> Q: Your [sic] trying to help yourself out in your own problems, aren't you?
>
> A: Yes, sir. Yeah, no question.

Assuming that the state had promised LaCour a better deal than he indicated at trial, disclosure of the terms of such a deal would have at best had a marginal negative impact on the jury's credibility assessment of LaCour. Therefore, "there is [no] reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

Pyles also claims that the state withheld evidence of Banschenbach and LaCour's past informant activities. Specifically, Pyles argues that he established at the evidentiary hearing that prosecutors were aware that Banschenbach had acted as an informant in a state prosecution in Las Vegas. He also

30

argues that he established that LaCour had operated as an informant for various law enforcement agencies, and that the prosecution had actual or constructive knowledge of some of these activities. Banks testified at the federal evidentiary hearing that he did not disclose what information he had regarding the history of LaCour and Banschenbach as informants because he did not consider it exculpatory. Assuming that the state had an obligation to disclose information regarding all of LaCour and Banschenbach's alleged informant activities,[15] Pyles is not entitled to habeas relief based upon the state's failure to produce this evidence because it is not material.

LaCour testified at trial that he was on unadjudicated probation for burglary, was currently incarcerated for two pending burglary charges to which he intended to plead guilty, and had a conviction for bank larceny. He also testified that he is a heroin addict and that he worked as an informant while on federal probation. Additionally, as noted earlier, LaCour acknowledged on cross-examination that his testimony was motivated in part--if not entirely--by the prospect that he would receive help from prosecutors in obtaining a lenient sentence on his burglary charges. Banschenbach testified that he had prior convictions for robbery, assault, burglary, grand theft, and passing bad checks. During direct examination, the prosecutor

---

[15] The parties dispute (1) whether the prosecution team had actual or constructive knowledge of some of the informant activities in question and (2) whether some of the informant activities alleged by Pyles ever occurred.

31

acknowledged that Banschenbach had "[b]een rather busy in [his] life of crime." Furthermore, he testified that he had previously worked as an informant in a county jail. Given the substantial body of impeachment evidence in the trial record against LaCour and Banschenbach, "any incremental impeachment value" that Pyles would have garnered from disclosure of additional informant activities by LaCour and Banschenbach "does not raise a reasonable probability that, had the [information] been disclosed . . ., the outcome of the proceeding would have been different." Drew v. Collins, 964 F.2d 411, 419-20 (5th Cir. 1992); see also United States v. Vgeri, 51 F.3d 876, 880 (9th Cir. 1995) (holding that the prosecution's failure to disclose information regarding a witness's past cooperation with law enforcement did not constitute a Brady violation in light of other impeachment evidence in the record, including testimony regarding the witness's extensive drug use and past cooperation with the DEA); United States v. Abello-Silva, 948 F.2d 1168, 1179, 1181 (10th Cir. 1991) (holding that the government's failure to disclose a deal whereby it dismissed a drug indictment against a witness who "was crucial to the government's case" was immaterial in light of testimony regarding the witness's prior felony convictions, extensive involvement in the drug trade, and past informant activity). The district court therefore properly denied Pyles habeas relief on his claim that the state withheld exculpatory evidence.

32

**III. CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the district court.