Ray Patrick THOMPSON, Petitioner,

v.

Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. Civ.A. H–97–1118.

United States District Court,
S.D. Texas.

April 3, 1998.

Ray Patrick Thompson, pro se.

Jennifer M. Owens, Office of Attorney General, Austin, TX, for Respondent.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

### I. *Introduction*

Petitioner Ray Patrick Thompson ("Thompson") challenges his 1993 conviction for first degree murder and sentence of life imprisonment. Having reviewed the pending motion, the submissions of the parties, the state court record, and the applicable law, this court is of the opinion that Gary L. Johnson's Motion for Summary Judgment (# 8) and Supplemental Motion for Summary Judgment (# 14) should be granted and that Ray Patrick Thompson's Petition for Writ of Habeas Corpus (# 1) should be denied.

### II. *Procedural History*

On November 15, 1993, a jury convicted Thompson of murder and assessed his punishment at life imprisonment plus a $10,000 fine. *See State v. Thompson,* No. 654919 (230th Dist. Ct., Harris County, Tex., Nov. 15, 1993). The Texas First Court of Appeals affirmed his conviction on August 17, 1995. *See Thompson v. State,* —— S.W.2d ——, No. 01-93-01123-CR, 1995 WL 489110 (Tex. App.—Houston [1st Dist.] Aug.17, 1995), *withdrawn.* Upon a motion for rehearing, the First Court of Appeals affirmed the judgment of the district court on January 11, 1996. *See Thompson v. State,* 915 S.W.2d 897 (Tex.App.—Houston [1st Dist.] 1996, writ ref'd). On August 28, 1996, the Texas Court of Criminal Appeals refused Thompson's pe-

tition for discretionary review. *See Thompson v. State,* No. 871–96 (Tex.Crim.App. Aug. 28, 1996).

Thompson subsequently filed a state application for a writ of habeas corpus, which the Texas Court of Criminal Appeals denied without written order on February 12, 1997. *See Ex parte Thompson,* No. 32,690–01 (Tex. Crim.App. Feb. 12, 1997). Thompson filed the instant petition for a federal writ of habeas corpus on April 3, 1997.

### III. *Claims*

Thompson raises the following claims in support of his petition for habeas corpus relief:

 A. the trial court erred when it failed to conduct a competency hearing *sua sponte;*

 B. trial counsel rendered ineffective assistance by:

 1. referring to Thompson's guilt during *voir dire* and closing argument;

 2. failing to raise the issue of insanity/incompetency and to request a psychiatric evaluation; and

 3. failing to prepare adequately for trial.

### IV. *Factual Background*

Thompson and Betty Jane Thompson ("Betty") were married on August 23, 1985. Betty Thompson brought with her four children from a previous marriage—Eugene, Steven, Richard, and Susan. Thompson and Betty had one child together—Brian. At the time of the marriage, Thompson worked for the Diday Funeral Home and co-owned Arrow Pest Control in Pasadena, Texas.

By 1991, Thompson and his wife had formed Thompson Pest Control. Betty quit her job at Entex to do the paperwork for the business, while Thompson did the exterminations. Although the business thrived, the marriage soured. Thompson and Betty increasingly fought about money and about the business. They also argued about the children and about Betty's involvement in the Pentecostal Church. These fights sometimes resulted in violence, with Thompson pushing and shoving Betty, and, on one occasion, Betty receiving a black eye. As the marriage continued to deteriorate, Betty's distrust of Thompson led her to keep a journal on him. Betty also checked Thompson's truck in an attempt to monitor his actions. Thompson filed for divorce but did not pursue it because he did not want Betty to receive the house and half of the business in a property settlement.

The Thompsons' marital problems were not a secret. As early as 1990, Betty began to confide in Willard Kirby, a police officer with the South Houston Police Department, regarding her unhappiness. Angel Flores ("Flores"), a neighbor, heard Betty and Thompson fighting three or four days a week. On one occasion, he saw Thompson slap Betty. Later in 1991, Thompson told Flores that he wished "something would happen" to Betty now that she was working nights as a reserve police officer at the South Houston Police Department. Thompson also stated in that conversation that he wished "somebody would get rid of her or something." In mid–1992, Thompson informed Frederick Connell ("Connell"), a fellow Jaycee and customer, that Betty was "ruining his business" by "following him around" and checking his telephone calls. In April of that year, Thompson told James Paige ("Paige"), a friend and former coworker, that "[h]e wished the bitch would die or leave."

In November 1992, Thompson discussed his marriage with Arnold Corbett ("Corbett"), a Pasadena police officer. He characterized his relationship with Betty as "intolerable." During that conversation, Thompson accused Betty of having a "volatile temper" and of becoming "intrusive and suspicious." Thompson also stated that "if he could find a way and if he thought he could get away with it, ... he would kill her." The following month, however, Thompson told Corbett that he "really wouldn't do such a thing." He added that "it would be foolish for [him] to ... make such a remark as that, and knowing that [Corbett] would suspect him first above all others if anything happened to her."

Also in November 1992, Thompson discussed his marriage to Betty with Randall Thompson ("Randall"), a bail bondsman whom he had recently met, and confided that

"[h]e wished she were dead." In December 1992, while exterminating Randall's ex-wife's house, Thompson told Randall that his marriage was "terrible" and "[t]hat he was going to have to have that bitch killed and it was going to be soon and d[id][he] know anybody that does things like that." The also inquired whether Randall wrote murder bonds and asked how much they cost. Randall advised Thompson, "if they don't have a body, they don't have a case." A few days after Christmas 1992, Thompson told Julie Banks ("Banks"), whose home he was exterminating, that he "was miserable in his marriage." He also advised Banks that Betty "had found the Lord" and was "driving him crazy." He further admitted that "he would not be happy until his wife was six feet under."

Toward the end of 1992, Fred Allen ("Allen"), a funeral director who had known Thompson since 1980, received a telephone call from him. During their conversation, Thompson asked Allen if the funeral company still transported bodies for the medical examiner. Thompson followed up that question by asking where the bodies were being stashed. On January 3, 1993, Thompson telephoned Allen at the Crystal Ray Funeral Home. regarding the purchase of a "disaster pouch," more commonly known as a body bag. Allen telephoned Jimmy Dean Donahoo ("Donahoo") at Escort Funeral Services, another establishment he owned, and informed him that Thompson would be coming by to buy the bag. After purchasing the body bag, Thompson asked Donahoo if he had any lime, a dissolving agent. Donahoo telephoned Allen and informed him that Thompson wanted some lime. Allen advised Thompson that he did not have any lime, but he did have a hardening compound, which could decrease the odor of decomposition. Thompson replied that he wanted lime.

In the afternoon of January 5, 1993, Thompson visited Apache Oil Company, where he spoke with Eric Martin Rothgeb ("Rothgeb"), a salesman and warehouseman. Thompson explained to Rothgeb that he wanted an open-lid barrel to use as a trash can for his shop. Rothgeb stated that he only had closed-top barrels but that Thomp-

son could have the top cut off one of them. Thompson left in his truck with an "Exxon blue" fifty-five gallon closed-top drum, which Rothgeb gave him. On January 6 or 7, 1993, Thompson took the barrel to Sexton's Welding and Fabrication where he spoke with the owner, Robert Sexton ("Sexton"). Thompson told Sexton that he wanted the top removed from the barrel, explaining that he was going to use the barrel to discard pesticide powder.

During a conversation between Thompson and Connell on January 7, 1993, the two men complained about their wives' recent involvement in religion. During the conversation, Thompson told Connell, "I'll be glad when I get rid of that fucking bitch." On the following day, James Masters ("Masters"), the owner of a Pasadena auto repair shop, received a telephone call from Thompson. Thompson informed Masters that his truck, a Dodge with a tommy lift, needed carburetor work. When Thompson brought the truck over, Masters noticed two bags of cement mix in the back.

On January 9, 1993, Thompson ran into Robert Washburn ("Washburn"), a retired Pasadena police officer, at a gun show. During this brief encounter, Thompson mentioned that he was at the show to buy a gun for his wife. According to Thompson, the gun would be a "surprise" for his wife. Later, Washburn again saw Thompson and told him that he had a Taurus .38 special that he would sell for $175. Thompson agreed to purchase the gun and picked it up that same day at Washburn's residence. While there, Thompson commented that he needed bullets for the gun. Washburn opened a box of shells and gave Thompson five of them. The forensic evidence revealed that the bullets in the box matched those that were found in Betty's body.

On the morning of January 11, 1993, Thompson and Betty had an argument about money, which Richard Thompson ("Ricky") overheard. Before the argument ended, Ricky left the house to make a bank deposit. When he returned, Thompson gave him some extermination jobs to handle. Later that morning, Thompson telephoned Masters to inform him that he needed to use his truck to

"pick up something heavy." Thompson also telephoned Sexton and informed Sexton that he needed the barrel "right away." Thompson then went to Sexton's shop and asked Sexton if he could use one of the storage sheds behind the shop to fill the barrel with insecticide powder. Sexton agreed and later noticed Thompson's truck backed up to one of the sheds. Thompson subsequently asked Sexton if he had any water for mixing cement to put on top of the pesticide. Between 2:00 and 2:30 p.m., Thompson asked Raymond Hooper ("Hooper"), who was working in another shed, to help him load some barrels onto his truck. According to Hooper, he assisted Thompson load two barrels—one blue and the other orange. Thompson and Hooper used the tommy lift to load one barrel at a time onto the truck. While helping Thompson, Hooper detected a heavy odor of pesticide. Hooper later noticed Thompson washing out the shed with what appeared to be water. Thompson asked Sexton to tack down the barrel so the hardening cement would not fall out. Sexton responded that one of his employees could do it in a few minutes. That afternoon, Mack Dickey, an employee at the shop, welded the top of the barrel shut. At approximately 3:30 p.m., Thompson returned to Master's auto shop, where he dropped off the Dodge truck.

Betty generally drove their five-year-old son, Brian Thompson ("Brian"), to school in the morning and picked him up in the afternoon. She also usually met her daughter, Susan Willis ("Susan"), for lunch. Susan worked at the same school Brian attended. On January 11, Betty failed to meet Susan for lunch, although they had spoken on the telephone earlier that morning. At about 4:30 p.m., Susan heard a voice over the school's intercom, asking if Brian had been picked up from school. Susan walked to the office, where she was told that Thompson was on the telephone. Susan subsequently went to the cafeteria and noticed that Brian, who usually left at 3:05 p.m., was still there. When Thompson arrived at the school at about 6:00 p.m. to pick up Brian, Susan asked Thompson if he had seen Betty. Thompson, not seeming concerned, responded that she had rushed out of the house at around 2:30 p.m. and had "[taken] off."

At about 1:00 a.m. on January 12, 1993, Ricky returned home and noticed that his mother's car was not parked outside. When Thompson answered the door, Ricky asked him about Betty. Thompson responded that he had not seen her since that afternoon. Later that morning, Ricky completed several extermination jobs. When he returned to the house, he noticed Thompson cleaning the house, which was highly unusual. The cleaning included mopping the floors, cleaning toilets, washing out sinks, and doing laundry. Thompson told Ricky that he was cleaning so that when Betty returned, "she would come home to a clean house." While helping prepare the house for Betty's return, Ricky found it peculiar that Thompson was washing a sweater that Betty always wore or carried with her.

Later that day, Thompson picked up the Dodge truck from Masters's auto shop. Thompson then telephoned Steven Willis ("Steve"), another of Betty's sons. During their conversation, Thompson, after describing some deer chili he had made, mentioned that Betty had been missing since the afternoon of January 11. According to Steve, Thompson did not seem concerned. Steve, on the other hand, was quite upset because he knew that his mother would not leave without calling him first. Thompson indicated that he had telephoned the Pasadena Police Department, but was told that nothing could be done for seventy-two hours. Testimony at trial by Officer T.K. Brinson ("Brinson"), however, revealed that the Pasadena Police Department had no such policy. As soon as Steve got off the phone, he contacted the South Houston Police Department, the Pasadena Police Department, and various friends in an attempt to locate Betty. As a result, Brinson filled out a concern-for-welfare report. Brinson subsequently telephoned Thompson to get more information about Betty. Upon receiving the call, Thompson acted surprised and explained that he had last seen his wife at 3:00 p.m. on January 11, 1993.

That same day, Thompson called George Roark, Jr. ("Roark"), the owner of Tanmon Inc., a trucking business, regarding a barrel

that he needed to discard. Thompson stated that he had to dispose of a barrel of pesticide waste because the EPA was after him. Roark informed Thompson that one of his trucks could throw the barrel onto a container going to a landfill. On January 13, Thompson appeared at Roark's place of business in his Dodge truck with the blue barrel. A Tanmon employee helped Thompson unload the barrel from the truck. Later that day, Thompson returned at Roark's business and insisted that he do something with the barrel that day. Consequently, Roark directed one of his employees, Joseph Charles ("Charles"), to bury the barrel on some property he owned near Brookshire, Texas, in Waller County.

On January 14, Thompson returned to Roark's business to confirm that the barrel had been discarded. That same day, Officer M.J. Bryant ("Bryant") interviewed Thompson. Thompson indicated that it was possible that Betty had left him because of marital discord. Thompson further admitted that he had once filed for divorce and confirmed that he and Betty had argued about money the day she disappeared. Bryant described Thompson's behavior as "cooperative."

On January 15, Thompson discussed Betty's disappearance with Ricky, indicating that it "was not really a big deal." In addition, Ricky looked for Betty's favorite sweater, the one Thompson had washed, but could not find it. A few days later, when questioned by the police if anything unusual occurred prior to Betty's disappearance, Ricky remembered that several days before she disappeared, Thompson had brought home a barrel in the Dodge truck. He described the barrel as being a distinctive blue color and bearing a sticker that read "Apache Oil Company." He told the police that Thompson had indicated that the barrel was for the disposal of chemicals. Ricky also advised the police that Thompson and he had taken the barrel to Sexton's shop to have the top welded off. On January 19, as the investigation into Betty's disappearance continued, Thompson told Corbett that "he missed [Betty]" and that "it was difficult to deal with day-to-day domestic business without her."

He also stated to Corbett, "I guess it doesn't look good what I said that time."

The following day, Thompson telephoned Jannie Pugh ("Pugh") at Kentucky Centennial Life Insurance and asked who the contingent beneficiary was on his $100,000 term life insurance policy. Pugh explained that it was Steve, his stepson. Thompson responded, "Steven has been out of the picture for some time. We need to change it." Later that day, Thompson appeared at the insurance agency to change the contingent beneficiary designation. Pugh informed Thompson that Betty would have to sign any changes to the policy. That afternoon, while Ricky was visiting his girlfriend at her apartment, Thompson arrived and asked Ricky to sign "some papers." Without reading the form, Ricky signed it. Thompson then returned to the insurance agency with the change-of-beneficiary form, which now contained Thompson's signature and a signature purporting to be Betty's. The form, witnessed by Ricky, indicated that Thompson's parents were the new contingent beneficiaries of the life insurance policy. Knowing that Betty was missing, Pugh found it suspicious that she could have signed the form. Her curiosity led her to compare Betty's alleged signature to her prior signature. According to Pugh, the signature on the form Thompson had brought "didn't look like Betty's signature at all." At trial, Thompson stipulated that the signature was not Betty's.

Meanwhile, Betty's older children continued to worry. They distributed flyers and contacted the media about her disappearance. Because Betty was a reserve police officer, the media carried the story of a missing police officer. Once the publicity started, many of the witnesses at trial voluntarily came forward with information. At the request of the police, on the afternoon of January 21, Charles, the truck driver who had buried the barrel, returned to the site along with Roark and law enforcement officers. After Charles indicated the location of the barrel, it was exhumed. Upon disinterring the barrel, the smell of a decomposing body filled the air. The processing of Thompson's Dodge truck led to the discovery of traces of blue paint on the bed of the

truck. Scrapings of the blue paint from the truck were compared to paint from the barrel. The crime laboratory determined that the scrapings originated from the same source. After the barrel was cut open at the Harris County morgue, a black body bag containing the remains of Betty, clad only in panties, was removed. The Harris County Medical Examiner determined the cause of Betty's death to be four gunshot wounds to the back.

On January 22, 1993, Thompson was charged with Betty's murder. Following his arrest, Thompson made numerous statements to other witnesses. After posting his bond, Randall picked Thompson up from the jail. On the way to Randall's office, Thompson stated, "I told you how bad things were." Thompson also lamented that "if the media would not have got involved ... everything would have been okay." He also admitted to Randall that he had bought the gun from an ex-policeman at a gun show, had obtained the barrel at Apache, had bought the body bag, and that the barrel had been buried on the property of an old friend of his. Upon arriving at Randall's office, Thompson indicated that he might skip out on the bond and inquired about finding a substitute bondsman. Randall stated, "Well, you kind of got me over a barrel now." According to Randall, Thompson replied, "Well, that's better than being in one" and laughed. While a patient at Bayshore Hospital shortly after being released on bond, Thompson stated to Randall that "he could watch the funeral out the back window from Bayshore ... and he could jack off as the funeral procession went by." Additionally, in the spring of 1993, Thompson admitted to Paige on three occasions that "he did do it" and that "he was glad that she was gone." Thompson also indicated to Paige that he killed Betty at their house and suggested that he did something to her back. Ray later led Paige to believe that the murder weapon is "in some water somewhere." According to Paige, who had lunch with Thompson about a month before the trial, he never expressed any remorse, sadness, or regret about Betty's death.

## V. Analysis

### A. Failure to Conduct a Competency Hearing

Thompson claims that the trial court erred by failing to conduct a hearing to determine Thompson's competency to stand trial.

■■■ A writ of habeas corpus is not granted to correct every error committed by the trial court, as only errors of constitutional magnitude are cognizable by a federal habeas court. See Mabry v. Johnson, 467 U.S. 504, 507, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984); see also 28 U.S.C. § 2254(a). To be actionable on federal habeas review, the trial court's errors must not have been merely an abuse of discretion, but so grave that they amounted to a denial of the constitutional right to substantive due process, i.e., that the errors made the trial fundamentally unfair. See Lassiter v. Department of Social Servs., 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). The test for determining whether trial court error made a trial fundamentally unfair is whether there is a reasonable probability that the verdict would have been different had the trial been conducted properly. See Guidroz v. Lynaugh, 852 F.2d 832, 835 (5th Cir.1988); Rogers v. Lynaugh, 848 F.2d 606, 609 (5th Cir.1988); Kirkpatrick v. Blackburn, 777 F.2d 272, 278–79 (5th Cir. 1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986) (citing Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)).

■■■ The United States Supreme Court has held that on federal habeas review of state court convictions, a federal harmless error standard applies. See Brecht v. Abrahamson, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Billiot v. Puckett, 135 F.3d 311, 318 (5th Cir.1998); Vanderbilt v. Collins, 994 F.2d 189, 198 (5th Cir.1993). Thus, to be actionable, the trial court error must have "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637, 113 S.Ct. 1710; see Billiot, 135 F.3d at 318; Shaw v. Collins, 5 F.3d 128, 132 (5th Cir.1993); Lowery v. Collins, 996 F.2d 770, 772 (5th Cir. 1993); Vanderbilt, 994 F.2d at 199. Under this standard, a petitioner is not entitled to

habeas relief based on trial court error unless he can establish that the error resulted in actual prejudice. *See Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. "[A] state defendant has no constitutional right to an errorless trial." *Bailey*, 744 F.2d at 1168 (citing *Banks v. McGougan*, 717 F.2d 186, 190 (5th Cir.1983)). Thus, in order to prevail on his claim of trial court error, Thompson must show both that the trial court erred and that the error rendered his trial fundamentally unfair.

■ The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that the trial of an accused be conducted only when he is mentally competent. *See Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996); *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). Hence, the trial and conviction of a defendant while he is mentally incompetent constitutes a denial of the defendant's due process right to a fair trial. *See Cooper*, 116 S.Ct. at 1376; *Medina*, 505 U.S. at 453, 112 S.Ct. 2572; *Drope v. Missouri*, 420 U.S. 162, 171–72, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). "Indeed, the right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination." *Cooper*, 116 S.Ct. at 1377 n. 4 (citing *Pate*, 383 U.S. at 384, 86 S.Ct. 836); *see Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir.1980).

■ To be competent to stand trial, it is not enough that the defendant is oriented to time and place and has some recollection of events. *See Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Rather, "the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.; accord Cooper*, 116 S.Ct. at 1377; *Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

In Texas, the test for incompetency to stand trial has been codified:

Art. 46.02 Incompetency to stand trial

Incompetency to stand trial

Sec. 1. (a) A person is incompetent to stand trial if he does not have:

(1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or

(2) a rational as well as factual understanding of the proceedings against him.

(b) A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence.

Raising the Issue of Incompetency to Stand Trial

Sec. 2. (a) The issue of the defendant's incompetency to stand trial shall be determined in advance of the trial on the merits if the court determines there is evidence to support a finding of incompetency to stand trial on its own motion or on written motion by the defendant or his counsel filed prior to the date set for trial on the merits asserting that the defendant is incompetent to stand trial.

(b) If during the trial evidence of the defendant's incompetency is brought to the attention of the court from any source, the court must conduct a hearing out of the presence of the jury to determine whether or not there is evidence to support a finding of incompetency to stand trial.

Examination of the Defendant

Sec. 3. (a) At any time the issue of the defendant's incompetency to stand trial is raised, the court may, on its own motion or motion by the defendant, his counsel, or the prosecuting attorney, appoint disinterested experts experienced and qualified in mental health or mental retardation to examine the defendant with regard to his competency to stand trial and to testify at any trial or hearing on this issue.

\* \* \* \* \* \*

Incompetency Hearing

Sec. 4. (a) If the court determines that there is evidence to support a finding of incompetency to stand trial, a jury shall be impaneled to determine the defendant's competency to stand trial. This determination shall be made by a jury that has not been selected to determine the guilt or innocence of the defendant. . . .

\* \* \* \* \* \*

TEX.CODE CRIM.PROC.ANN. art. 46.02.

The issue of competency may arise in two distinct contexts in a habeas corpus proceeding. *See United States v. Williams,* 819 F.2d 605, 607–09 (5th Cir.1987), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988); *Enriquez v. Procunier,* 752 F.2d 111, 113–14 (5th Cir.1984), *cert. denied,* 471 U.S. 1126, 105 S.Ct. 2658, 86 L.Ed.2d 274 (1985); *Johnson v. Estelle,* 704 F.2d 232, 237 (5th Cir.1983), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 237 (1984); *Lokos,* 625 F.2d at 1261–62. First, a habeas petitioner may allege that state procedures were inadequate to ensure that he was competent to stand trial. *See id.* at 1261 (citing *Pate,* 383 U.S. at 375, 86 S.Ct. 836). Thus, a petitioner may claim that the evidence before the trial court presented a *bond fide* doubt as to his competency and, therefore, the court was required to hold a competency hearing before proceeding to trial. *See Williams,* 819 F.2d at 607; *Enriquez,* 752 F.2d at 113; *Johnson,* 704 F.2d at 238. Alternatively, a habeas petitioner may collaterally attack his conviction by showing that at the time of trial he was incompetent in fact. *See Williams,* 819 F.2d at 607; *Johnson,* 704 F.2d at 238; *Lokos,* 625 F.2d at 1261; *Zapata v. Estelle,* 588 F.2d 1017, 1020–21 (5th Cir.1979). Hence, a petitioner may challenge his state conviction by directly alleging incompetence at the time of trial, thereby claiming a violation of his substantive right not to be tried and convicted while incompetent, rather than of the procedural guarantee of a competency hearing in the event that a *bona fide* doubt arises at trial as to competency. *See Reese v. Wainwright,* 600 F.2d 1085, 1093 (5th Cir.), *cert. denied,* 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979).

The inquiry under the *Pate* procedural due process standard is whether the trial judge received information which, objectively considered, "should reasonably have raised a doubt about the defendant's competency and alerted [the court] to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Williams,* 819 F.2d at 607; *see Lokos,* 625 F.2d at 1261. Although the Supreme Court has not articulated a general standard for the nature or quantum of evidence necessary to trigger a competency hearing, it has focused on three factors that should be considered: (1) the existence of a history of irrational behavior; (2) the defendant's bearing and demeanor at the time of trial; and (3) prior medical opinions. *See Williams,* 819 F.2d at 608; *Enriquez,* 752 F.2d at 113; *Lokos,* 625 F.2d at 1261. Under the *Pate* test, to avoid a procedural due process violation, a trial court must inquire into the defendant's mental capacity *sua sponte* if the evidence raises a *bona fide* doubt as to his competency. *See Pate,* 383 U.S. at 385–86, 86 S.Ct. 836; *McInerney v. Puckett,* 919 F.2d 350, 351–52 (5th Cir.1990). If a *Pate* violation is established, the federal habeas court must consider whether a meaningful hearing can be held *nunc pro tunc* to determine retrospectively the petitioner's competency as of the time of trial. *See Williams,* 819 F.2d at 609; *Lokos,* 625 F.2d at 1262. If so, the petitioner bears the burden of proving his incompetence by a preponderance of the evidence; if not, the habeas writ must be granted, subject to retrial at the State's discretion. *See id.*

As to the substantive inquiry, incompetency may be raised in a post-conviction proceeding even if no competency hearing was requested by the defendant at or before the state trial. *See Enriquez,* 752 F.2d at 114; *Zapata,* 588 F.2d at 1021. Nevertheless, "[t]he burden imposed upon a habeas petitioner to demonstrate incompetency in fact at the time of trial is extremely heavy." *Johnson,* 704 F.2d at 238. The Supreme Court has upheld the approach, adopted under Texas law, that, at trial, the "State may presume that the defendant is

competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence." *Cooper,* 116 S.Ct. at 1377; *Medina,* 505 U.S. at 449, 112 S.Ct. 2572; *Bouchillon v. Collins,* 907 F.2d 589, 592 (5th Cir.1990). To prevail on an incompetency claim on federal habeas review, the "petitioner must present facts sufficient 'to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to [his] mental capacity ... to meaningfully participate and cooperate with counsel....'" *Williams,* 819 F.2d at 609 (quoting *Bruce v. Estelle,* 483 F.2d 1031, 1043 (5th Cir.1973)); *accord Enriquez,* 752 F.2d at 114; *Johnson,* 704 F.2d at 238; *Reese,* 600 F.2d at 1093.

■ In this case, Thompson appears to claim both that the state trial court violated his due process rights by failing to conduct a hearing on his competency to stand trial *sua sponte* and that he was, in fact, incompetent at the time of trial in November 1993. In support of his procedural due process claim, Thompson alleges that numerous events occurred that should have led the court to halt the trial and *sua sponte* grant a competency hearing. In his petition, Thompson specifies the facts and circumstances that he contends indicate a diminished mental capacity. First, Thompson avers that his alleged method for the planning, execution, and disposal of his wife's remains, as well as his "flat affect after the crime occurred," should have prompted the trial judge to question Thompson's competency to stand trial. A seemingly irrational crime, without more, does not place the trial court on constructive notice of a defendant's incompetency. *See Johnson,* 704 F.2d at 239. This, however, does not appear to be an irrational crime. To the contrary, the evidence of Thompson's long-standing hatred for his wife and his desire that she die rather than obtain a divorce so he could keep the house and business, as well as his careful planning of the crime, orderly procurement of the necessary equipment, well-timed execution of the murder, and subsequent concealment of the body and the gun suggest that he had full control of his mental faculties. Moreover, after the murder, aside from two brief incidents immediately following his

arrest, he generally appeared calm and even joked about the crime.

Second, Thompson claims that Flores, a neighbor, testified that Thompson had stated that he was tired of living. A review of Flores's trial testimony reveals that Thompson's recollection of the evidence stops short. Thompson did not tell Flores that he was tired of living, but that "he was tired of being, living with her." Third, after his arrest, Thompson stated to Corbett that he was sick. During trial, Corbett testified that in a telephone conversation on January 20, 1993, Thompson made what he considered to be a farewell speech. He explained that his conversation with Thompson was "emotional," that he "sounded depressed," and "he came away with the opinion that it was the prelude to a suicide attempt." Corbett conceded, however, that he had no personal knowledge of whether Thompson subsequently attempted to commit suicide.

Fourth, Thompson's bail bondsman, Randall, testified that he believed that Thompson was in a "mental deal in the new jail" and that he saw red marks on his neck, purportedly from a suicide attempt. Consequently, Randall made inquiries about Thompson being admitted to Bayshore Hospital following his release on bond on January 23, 1993. Finally, Ray Thompson, Sr. ("Ray, Sr."), the petitioner's father, testified that after Thompson was released from jail he had sounded depressed over the telephone, and when Ray, Sr. went over to make sure he was all right, he could smell natural gas in the house. Thompson, however, had "already turned the gas off" by the time his father arrived.

■ Thompson also attached to his petition his medical records from the Skyview Unit of the Texas Department of Criminal Justice ("TDCJ") dated September 1995, indicating that he has experienced mental problems while incarcerated, along with his discharge papers from the United States Navy dated November 1975, showing that he received an early discharge for "character and behavioral disorders." There is no evidence, however, that Thompson's problems in the Navy were ever brought to the attention of the trial court. Obviously, his 1995 TDCJ

records did not exist at the time of trial and, therefore, could not have been brought to the attention of the judge. In addition, no medical records from Bayshore Hospital were admitted at trial nor were they furnished to the court. As the Court of Appeals noted, "there's nothing in the record to confirm that appellant was admitted to the hospital or whether he was examined by a physician. Even if there were, the fact that a defendant has been treated by a psychiatrist does not constitute evidence that the defendant is incompetent to stand trial. *Gilbert v. State,* 852 S.W.2d 623, 627 (Tex.App.—Amarillo 1993, no pet.) (citing *Leyva v. State,* 552 S.W.2d 158, 161 (Tex.Crim.App.1977))."

It is well established that a *Pate* inquiry focuses on what was known to the trial court at or immediately preceding the trial, not on evidence later developed. *Reese,* 600 F.2d at 1093. "The complaint that a *Pate* procedural guarantee was violated is that, in light of what was then known to the trial court, the failure to make further inquiry into defendant's competence to stand trial denied him a fair trial." *Lokos,* 625 F.2d at 1261 (citing *Drope,* 420 U.S. at 174, 95 S.Ct. 896). "*Pate* does not require that a trial judge be an omniscient psychiatrist, but that he act reasonably on the objective facts put before him." *Reese,* 600 F.2d at 1092. It is undisputed that neither trial counsel nor the defendant ever requested a competency hearing. The Fifth Circuit has found that "the failure of defendant or his counsel to raise the competency issue [is] persuasive evidence that no *Pate* violation occurred." *Reese,* 600 F.2d at 1092 (citing *Grissom v. Wainwright,* 494 F.2d 30, 32 (5th Cir.1974); *Jackson v. Caldwell,* 461 F.2d 682, 693–94 (5th Cir.), *cert. denied,* 409 U.S. 991, 93 S.Ct. 334, 34 L.Ed.2d 257 (1972)). In this instance, the only facts known to the court were those brought out during the trial. The sole evidence before the court from which any concerns about Thompson's mental health could be inferred was testimony suggesting that Thompson had twice attempted to commit suicide and the subjective opinion of two lay witnesses that he sounded depressed shortly before and after his arrest. This evidence is insufficient to impose a duty on the trial

court to convene a second jury to hold an incompetency hearing.

First, these events occurred over a brief period of time at least nine months prior to trial. There is no evidence in the record that Thompson was displaying any aberrant behavior at the time of trial or in the subsequent months preceding the trial. Indeed, the evidence presented at trial reflects that Thompson spoke to a number of witnesses in a rational and coherent manner during the months leading up to his trial. He resumed his exterminating business and regained most of his prior business. In fact, he informed Paige before trial that his business was "picking back up" and advised Banks that "[h]e had 90 some odd percent of his business back."

Second, a history of mental illness and/or attempts at suicide do not *per se* establish a defendant's incompetency to stand trial. *See McCoy v. Lynaugh,* 874 F.2d 954, 960–61 (5th Cir.1989); *Williams,* 819 F.2d at 608; *Johnson,* 704 F.2d at 237; *Eastham v. State,* 599 S.W.2d 624, 627–28 (Tex.Crim.App.1980); *Bledsoe v. State,* 519 S.W.2d 646, 646 (Tex.Crim.App.1975); *Gilbert,* 852 S.W.2d at 627. Generally, "there must be evidence of recent severe mental illness or bizarre acts by the defendant or of moderate retardation." *Mata v. State,* 632 S.W.2d 355, 359 (Tex.Crim.App.1982). In this case, the Court of Appeals concluded:

Symptoms of depression and evidence of suicide attempts, arguably reasonable reactions to being charged with the murder of one's wife, do not amount to evidence of "recent severe mental illness." More significantly, the events referred to occurred during or shortly after appellant was in jail in January, more than nine months prior to trial. No evidence from any source was brought to the trial court's attention regarding the appellant's ability in November of 1993 to consult with his lawyer and understand the proceedings against him as required by article 46.02, section 1.

*Thompson,* 915 S.W.2d at 902. The Fifth Circuit found in a similar case that "[a]bsent any medical history, irrational behavior, or odd demeanor at trial, the trial judge was entitled to conclude, in light of all that was

known to him" that the defendant was competent to stand trial. *McInerney*, 919 F.2d at 352.

In this instance, there was insufficient evidence before the trial court to raise a *bona fide* doubt of Thompson's competency so as to require the court to hold a competency hearing *sua sponte* before proceeding with trial. Under the circumstances, Thompson has not demonstrated that the trial court committed error, much less an error of constitutional dimension that rendered his trial fundamentally unfair. As the Fifth Circuit observed in *Reese*, " '(O)ne cannot fault a trial judge for failing to determine a question that he has no reason to believe is an issue.' " 600 F.2d at 1093 (quoting *Davis v. Alabama*, 545 F.2d 460, 464 (5th Cir.), *cert. denied*, 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977)). Therefore, Thompson's claim of trial court error must be rejected.

Thompson's substantive claim of actual incompetency fares no better. The TDCJ records, including a psychological evaluation, post-date his trial by almost two years. Even if Thompson had signs of mental illness in September 1995, that does not mean that he was so dysfunctional in November 1993 that he was unable to consult with counsel or lacked a rational and factual understanding of the proceedings. Medical records and psychological examinations made after a criminal trial are not relevant in determining whether a defendant was competent at the time of trial. *See Profitt v. Waldron*, 831 F.2d 1245, 1250 (5th Cir.1987); *Reese*, 600 F.2d at 1093. Similarly, Thompson's Navy records, predating the trial by eighteen years, provide no basis for inferring that he was incompetent to stand trial for the murder of his wife in November 1993. While his discharge papers show that he was discharged from the Navy for alleged character and behavioral disorders, the attached psychological evaluation indicates that Thompson was immature and was having difficulties conforming to life in the military. His exact diagnosis was "Personality Disorder, Immature Type ... with passive-aggressive asthenic characteristics." A twenty-year-old's distress about the idea of putting out to sea for an extended period of time would be neither unusual nor an unreasonable response to the situation. Furthermore, Thompson undoubtedly was not the only sailor to have hostile thoughts toward one of his superiors at boot camp or even to feign psychological problems to get out of the Navy early. The psychologist recommended Thompson's discharge not for any question as to his sanity, but because he "will probably become an administrative nuisance and become an increasing disciplinary problem," as well as "a regular visitor at sick call." In any event, the Navy discharge was eighteen years prior to trial, and nothing in the record indicates that Thompson was unable to function at the time of trial. To the contrary, since leaving the Navy, Thompson had worked regularly, had owned two businesses, and had become a productive and successful businessman, without any felony convictions, who was active in civic affairs and involved in local politics in Pasadena.

In an eleven-page statement signed by Thompson, dated December 22, 1994, which was attached to his appellate brief, Thompson details his version of the progress of his case from a month or two after his arrest through the filing of the notice of appeal. In this document, Thompson recounts his efforts to retain counsel, his discussions with his attorney regarding his defense, his concerns about tactical decisions made by counsel, and his physical condition at the time of trial. He claims that he brought up his past military record and asked whether that could aid his defense, an inquiry that trial counsel purportedly ignored. In addition, he explains how he discussed with his attorney the possibility of bringing up Betty's "jealousy, insecurities, domineering, manipulating, sevielance [sic] ... [and] short temper." According to Thompson, his lawyer indicated that no one could bring up or mention her bad habits "and no one will bring up any of your bad habits." Thompson concedes that his "incriminating habits might include heavy drinking, occasional marijuana and cocaine use, and accusation's [sic] of infidelity." He also mentions that his "former wife had also collected and stored away various drug paraphernalia, which the police had in their possession."

In addition, Thompson details his investigation into a possible attack on the State's evidence based on a purported gap in the chain-of-custody of the barrel, his recruiting of character witnesses, and his passing along to counsel a card from another attorney who reportedly had information about the case. Although Thompson regales the reader with such incidents as throwing up during the trial to the point that the bailiff had to place a trash can next to his chair, none of his allegations suggests that he was mentally incompetent. Thompson also describes how, when his attorney was unable to obtain a continuance to delay the trial, he was admitted to the hospital for treatment of alleged hypertension after his lawyer told him that "the only thing that would reset [the trial] would be if [he] was hospitalized." Despite his efforts to avoid trial, his physician released Thompson from the hospital to stand trial as scheduled. Presumably, if he had been suffering from a medical problem, physical or mental, the physician would not have released him from the hospital. These actions, as Thompson relates, are not those of a person unable to assist his trial counsel or without an understanding of the nature of the proceedings. Rather, they are actions of one who was keenly aware of the impending trial, actively participated in preparing his defense, and even attempted to avoid trial by feigning illness. Indeed, Thompson's written statement undermines the notion that he was incompetent to stand trial.

Moreover, in a sworn affidavit, Jim Skelton ("Skelton"), Thompson's trial counsel, confirms that Thompson was able to consult with him and appeared to have an understanding of the nature of the proceedings. He also recounts the incident in which "Thompson told [him] that he was going to admit himself into the hospital to avoid the trial setting." Skelton states that Thompson "had no problem communicating with [him] and never gave any indication he was suffering from a mental defect that rendered him legally incompetent or insane."

In this situation, Thompson has failed to adduce sufficient evidence that, at the time of trial, he lacked the present ability to consult with his lawyer with a reasonable degree of rational understanding or lacked a rational or factual understanding of the proceedings against him to warrant an evidentiary hearing. A petitioner is entitled to a *nunc pro tunc* evidentiary hearing for the purpose of proving that he was incompetent at the time of trial only "when he makes a showing by clear and convincing evidence to raise threshold doubt about his competency." *Lokos,* 625 F.2d at 1261. " 'Courts in habeas corpus proceedings should not consider claims of mental incompetence to stand trial where the facts are not sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner....' " *Enriquez,* 752 F.2d at 113 (quoting *Bruce,* 483 F.2d at 1043). Thus, in this case, because no legitimate doubt exists as to his mental capacity, Thompson's claim of actual incompetence to stand trial must fail.

### B. Ineffective Assistance of Counsel

Thompson contends that his trial counsel's representation was deficient in a number of respects. Specifically, he claims that his attorney improperly referred to his guilt during *voir dire* and closing argument, failed to raise the issue of his insanity or incompetency to stand trial, and failed to prepare adequately for trial.

To prevail on a claim based upon the alleged ineffectiveness of counsel, a habeas petitioner, must satisfy a two-prong test. *See Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, he must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness. *See id.* To make this showing, he must overcome a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance. *See id.* at 698, 104 S.Ct. 2052; *Ransom v. Johnson,* 126 F.3d 716, 721 (5th Cir.), *cert. denied,* — U.S. ——, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997); *Amos v. Scott,* 61 F.3d 333, 347 (5th Cir.), *cert. denied,* 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995);

*Teague v. Scott,* 60 F.3d 1167, 1170 (5th Cir.1995); *Gray v. Lynn,* 6 F.3d 265, 268 (5th Cir.1993). When reviewing such claims, "[j]udicial scrutiny of counsel's performance must be highly deferential," uncolored by "the distorting effects of hindsight." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see Amos,* 61 F.3d at 347–48; *Teague,* 60 F.3d at 1170; *Gray,* 6 F.3d at 268.

Second, the petitioner must show that the deficient performance prejudiced his defense. *See Fretwell,* 506 U.S. at 370–72, 113 S.Ct. 838; *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Ransom,* 126 F.3d at 721; *Mangum v. Hargett,* 67 F.3d 80, 84 (5th Cir.1995), *cert. denied,* 516 U.S. 1133, 116 S.Ct. 957, 133 L.Ed.2d 880 (1996); *Gray,* 6 F.3d at 269. He must demonstrate that but for counsel's unprofessional errors, the result of the proceeding would have been different and that counsel's errors were so serious as to deprive him of a fair trial, a trial with a reliable result. *See Fretwell,* 506 U.S. at 370–72, 113 S.Ct. 838; *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Sharp v. Johnson,* 107 F.3d 282, 286 n. 9 (5th Cir.1997); *Mangum,* 67 F.3d at 84; *Amos,* 61 F.3d at 348; *Williams v. Collins,* 16 F.3d 626, 631 (5th Cir.), *cert. denied,* 512 U.S. 1289, 115 S.Ct. 42, 129 L.Ed.2d 937 (1994); *Gray,* 6 F.3d at 269.

Hence, to prevail on his ineffective assistance of counsel claim, Thompson must show both deficient performance of counsel and resulting prejudice. *See Strickland,* 466 U.S. at 700, 104 S.Ct. 2052; *Ransom,* 126 F.3d at 721; *Tucker v. Johnson,* 115 F.3d 276, 280 (5th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 605, 139 L.Ed.2d 492 (1997); *Mangum,* 67 F.3d at 84; *James v. Cain,* 56 F.3d 662, 667 (5th Cir.1995); *Williams,* 16 F.3d at 631. Because a petitioner must satisfy both prongs of the *Strickland* test, the failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052; *accord Amos,* 61 F.3d at 348; *Armstead v. Scott,* 37 F.3d 202, 210 (5th Cir.1994), *cert. denied,* 514 U.S. 1071, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1995); *Black v. Collins,* 962 F.2d 394, 401 (5th Cir.), *cert. denied,* 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992); *United States v. Pierce,*

959 F.2d 1297, 1302 (5th Cir.), *cert. denied,* 506 U.S. 1007, 113 S.Ct. 621, 121 L.Ed.2d 554 (1992).

### 1. *Comments by Counsel During Voir Dire and Closing Argument*

Thompson avers that his trial counsel was ineffective because he improperly admitted Thompson's guilt during *voir dire* and closing argument.

During *voir dire,* Thompson's trial counsel made the following statements:

[T]he thing that troubles me as a lawyer in working with juries is that we all have a certain amount of hypocrisy in trying a case. I don't mean to be rude or crude.

Let's talk about the case specifically, I've never done this before in a trial and I need to explain a little bit of what we are going to be doing while we are here. Normally when you get in front of a jury, you always say your client is not guilty. That's the stance that lawyers always take and I need to be very candid and in turn I want you to be just as candid with me.

I've read the same articles you have read in the newspapers. I've got a collection of them. I've seen the television reports that you have seen. I also know what the evidence is going to be presented in this case and in my opinion the only thing we are going to resolve here is the question of punishment. And the reason, and there are several ways a lawyer can approach this. A lawyer can get up and enter a plea of guilty to a jury and the reason that's not being done, and let me explain to you because I'm not trying to educate a law class....

The reason we are not doing that is because there are certain things that you waive in the event of appeal by pleading guilty to a jury. And I'm not trying to delay things, but there are certain things I have got to do as a lawyer to make sure the trial is conducted properly. I think what we are going to be here is for an issue of punishment and I can say that with all candor before I've never done that with jurors.

I've talked to Ray about it and his family and I think before the day is up 12 of you

folks are going to be and eventually toward the end of the week.talking about punishment, what somebody deserves for being convicted of murder.

Furthermore, during closing argument, Thompson's attorney stated:

As I told you folks on Wednesday morning, that Ray Thompson and I both agreed and talked about this and we thought that the real issue in this case would be punishment. Ray and I both believe, I'm not going to—we should not insult people's intelligence and the real issue in this case we have always believed is one of punishment.

I told you that Wednesday and I reiterate the same thing today. All I want to do in behalf of Ray Thompson and myself is to thank you for listening to this thus far and again we will reserve what we have to say later because I think there will be a punishment hearing. Thank you very much.

Johnson does not dispute that Thompson's trial counsel made numerous references in which he impliedly admitted Thompson's guilt and emphasized the more important part of the case would be the punishment phase.

Although this may initially appear to an unorthodox approach to the defense of a criminal case, Skelton explains in his affidavit that, after reviewing the evidence and consulting with Thompson and his family, he concluded that the best strategy would be to appear open and honest to the jury in hope of mitigating punishment by obtaining a sympathetic jury. To this end, during *voir dire*, Skelton asked questions such as, "[L]et's assume you are on a jury and there is no reasonable doubt in your mind that the person is guilty of taking a human life, what sort of evidence would you look for to help you assess punishment?" When questioning potential jurors individually, Skelton repeatedly inquired about their views on punishment, specifically, whether punishment should serve primarily to protect society or to rehabilitate those found guilty of crimes.

In his affidavit, Skelton outlines the facts that were in the State's file prior to trial. After evaluating the case, Skelton was of the opinion that there was no guilt/innocence issue. Based on his extensive experience as a criminal defense lawyer, Skelton was convinced that no jury would acquit Thompson. Thus, the only viable alternative, in Skelton's view, was to attempt to obtain a favorable jury for punishment. In his affidavit, Skelton explains in detail his analysis of the case and the reasoning behind the strategy he pursued:

I was convinced that no jury would acquit Mr. Thompson because every witness had known him for several years and there was no reason they would manufacture these statements. The best approach would have been to enter a guilty plea to the jury and attempt to explain the murder came from the stormy relationship between Mr. Thompson and his wife-complainant. She was no saint and there was much about her conduct that could have mitigated punishment.

I did not follow this path because of the so-called *Helms* and *DeGarmo* Rule, which holds an admission of guilt waives all error except for jurisdictional defects. I had convinced the trial judge to exclude the following extraneous acts:

1. Mr. Thompson was a cross-dresser. His wife kept a diary of his activities and a bag of women's clothing that Mr. Thompson had previously worn. This was in his wife's police locker at the South Houston Police Department. When I asked Mr. Thompson about this, he explained his wife came from an impoverished background and wanted to remain married to him because they were making in excess of $100,000 per year in the exterminating business; that she told him numerous times if he attempted to divorce her, she would expose him by the evidence she had hidden away.

2. Another statement in the State's file came from a witness who worked with Mr. Thompson in the funeral business. He implied that Mr. Thompson was involved in sexual activity with corpses because they referred to the embalming room as the 'room of joy.'

3. Mr. Thompson had a foot fetish. He attempted to suck his oldest step-son's toes and thereafter, the step-son slept with a hunting knife to protect himself from Mr. Thompson. This is the same step-son who initially notified the police that his mother was missing and he gave a detailed statement to the police about Mr. Thompson's fetish and Mr. Thompson's attempts to attack his toes.

4. There was a good deal of information in the State's file claiming Mr. Thompson was bi-sexual; that he cruised the Montrose area from time to time searching for male sexual companions.

This line of evidence led me to the conclusion that a guilty plea to the jury would be risky. If the trial judge changed her mind and decided to admit some of the above evidence, either at guilt innocence or the punishment phase, it would not be reversible on appeal because of *Helms* and *DeGarmo*. This evidence also precluded the age old means of mitigating punishment by showing the murder victim's death notice should be in the civic improvement section of the newspaper. I was unable to go into any of the victim's conduct or show that she was the wife-from-hell because had I done so, the State could come back with the reasons she was cranky, by explaining Mr. Thompson was always attempting to suck her kids [sic] toes and wear her clothing between bouts of cruising Montrose for boys and fondling corpses.

I thought the only hope Mr. Thompson had was to be frank with the jury and tell them he was not contesting guilt and the only issue involved punishment. I discussed this with Mr. Thompson and his family. Mr. Thompson's Father was retired and was living in Arkansas and he had a sister who lived near Galveston. There might have been a brother also, I do not recall. But none-the-less, I talked extensively with the family about the problems this case posed and made one or two trips to Galveston to discuss it with Mr. Thompson's sister. There [sic] were all aware of what I intended to do.

I also went over this with Mr. Thompson. I explained the danger of a jury being told about his past conduct and sexual practices. The only way I knew to keep this from the jury was to take the route I did. I knew I would eventually be facing a jury at punishment and I needed the credibility of being honest with them in an attempt to mitigate punishment. Everyone knew what I planned to do and knew why I said what I said at voir dire.

■ Thus, Skelton's approach during *voir dire* and closing argument was a matter of trial tactics and strategy. "Tactical and strategical decisions of counsel 'if based on informed and reasoned practical judgment' will not be second-guessed." *Ransom*, 126 F.3d at 721 (citing *McCoy*, 874 F.2d at 964)) (quoting *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir.1985), *cert. dismissed*, 475 U.S. 1138, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986))). Skelton's decision to concentrate his efforts on the mitigation of punishment was a "conscious and informed decision based on trial tactics and strategy" which, like all such decisions, cannot form the basis for habeas corpus relief unless "it is so ill-chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir.1983); *accord Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir.1997); *Teague*, 60 F.3d at 1172; *see Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052; *Moreno v. Estelle*, 717 F.2d 171, 177 (5th Cir.1983), *cert. denied*, 466 U.S. 975, 104 S.Ct. 2353, 80 L.Ed.2d 826 (1984); *Daniels v. Maggio*, 669 F.2d 1075, 1079 (5th Cir.), *cert. denied*, 459 U.S. 968, 103 S.Ct. 295, 74 L.Ed.2d 278 (1982). Such strategic decisions do not form a sufficient basis for Sixth Amendment claims of ineffective assistance of counsel. *See Jones v. Butler*, 864 F.2d 348, 366 (5th Cir.1988), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989).

■ Under the circumstances, where the jury had heard overwhelming, properly admitted evidence of Thompson's guilt, and the sole issue reasonably open to question was the punishment that would be imposed, an attempt to mitigate punishment was the only realistic trial strategy. "[T]he Sixth Amendment does not require that counsel do what

is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interest of his client by attempting a useless charade." *United States v. Cronic,* 466 U.S. 648, 657 n. 19, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (citing *Nickols v. Gagnon,* 454 F.2d 467, 472 (7th Cir.1971), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2504, 33 L.Ed.2d 336 (1972)). It was this "useless charade" that Skelton was trying to avoid, in the hope that his candor would lead the jury to look more favorably upon Thompson when assessing punishment. This strategy is evident in counsel's statement during closing argument in the punishment phase:

As we talked at the very beginning of this trial, I told you then that one thing that we were going to do is never take issue with the fact that Ray Thompson killed Betty Thompson, told you that to begin with and attempted as best we could to be as honest with you about the evidence in this case and not try to mislead you and try to be honest with you. All I'm trying to do with you in these arguments, you be just as honest with yourself and honest with the system, how to evaluate this case. That's all I'm asking.

■ Thompson also complains that Skelton never attempted to develop a defense and presented no witnesses on his behalf in the guilt/innocence phase. Counsel cannot be faulted, however, for failing to pursue a defense that is not supported by the evidence. *See Schwander v. Blackburn,* 750 F.2d 494, 499–500 (5th Cir.1985); *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir.1984). An attorney is not remiss in failing to advance a viable defense when none exists. This is not a situation where "counsel entirely fails to subject the prosecutor's case to meaningful adversarial testing." *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039. Rather, the record reflects, and Thompson concedes, that Skelton satisfactorily cross-examined the State's witnesses and made necessary objections, precluding the admission of harmful testimony. Counsel still held the prosecution to its heavy burden of proof beyond a reasonable doubt. *Id.* at 657 n. 19, 104 S.Ct. 2039. Merely because the chosen strategy ultimately

proved to be ineffective does not mean that Thompson's trial counsel was ineffective.

■ Moreover, even if Skelton's representation were found to be deficient in some respect, Thompson still has not shown that he was prejudiced by counsel's performance. In view of Thompson's "glaring guilt," as he terms it in his traverse to Johnson's answer, there is no reason to believe that he would have been acquitted of murdering his wife under any plausible scenario. Not only was there strong circumstantial and forensic evidence of his guilt, but he confessed to committing the crime to Paige on three occasions and described to Randall how Betty had been killed and stuffed in a barrel. In addition, although Thompson had no prior felony convictions, due to the nature and circumstances of this offense, it is unlikely that he would have received less than the maximum punishment of life imprisonment. In light of the testimony revealing his premeditation of the crime, calculated execution of the murder, concealment of the body, lack of remorse, and utter contempt for his wife's memory, as manifested by the "jack off" and "in the barrel" comments, Thompson did not evoke sympathy. Moreover, his actions showed callous disregard for the welfare of Brian, his five-year-old son, who was left without a mother. This is not a case where leniency would have been at the forefront of the, jurors' minds, no matter what his lawyer did or said. Now, Thompson, rather than acknowledging his own culpability for his wife's murder, seeks to blame his attorney for his conviction and sentence of life imprisonment. As the Fifth Circuit has recognized, "the tendency, when all else fails, [is] to blame the lawyer." *United States v. Faubion,* 19 F.3d 226, 231 (5th Cir.1994). Blame in this case, however, lies squarely on Thompson, not on his lawyer, who furnished reasonable professional assistance to Thompson whose actions simply were not defensible.

### 2. *Failure to Raise Insanity/Incompetency*

Thompson further contends that his trial counsel was ineffective because he failed to challenge Thompson's competency to stand trial, to investigate his sanity at the time of

the offense, and to request a psychiatric evaluation. Thompson asserts that his trial counsel knew or should have known that he had experienced mental health problems while in the Navy. Additionally, Thompson asserts that testimony given during the punishment phase of the trial raised the issue of his sanity at the time of the offense.

Skelton addresses these issues in his affidavit:

> Mr. Thompson also made some claims about his mental state and the fact that he had a history of mental problems. I knew Mr. Thompson was in a psychiatric ward following his attempted suicide in jail. Everyone associated with the case knew this. I do not recall Mr. Thompson telling me about prior mental problems while he was in the service or his claim he was discharged for character or behavior disorders. But regardless of his past problems, he had no problem communicating with me and never gave any indication he was suffering from a mental defect that rendered him legally incompetent or insane.

> \* \* \* \*. \* \*

> Even if Mr. Thompson had some prior mental hospitalization or treatment, I would have been reluctant to attempt an insanity plea or claim of mental incompetency. As to insanity—there must be some indication the Accused did not know his conduct was wrong. The telling fact is the conduct following the killing. If the person makes some attempt to hide his crime, then he obviously knows his conduct is wrong and he is legally sane even though the flapper in his bell may be missing. It is obvious from the facts here, that Ray Thompson took steps to hide the murder of his wife and knew his conduct was wrong.

> As to competency—there must be some indication the Accused is suffering from a mental defect that renders him incapable of communicating with his lawyer and preparing a defense to the charges. This was not the case with Mr. Thompson. He had no problem telling me about his past or the facts of the case. His problem was that he had no defense to the murder charge and left a giant trail of evidence to convict him.

> Finally, pleading insanity would have kicked off an examination by a State psychiatrist and would have opened to [sic] door to the introduction of the past sexual conduct I was attempting to keep from the jury. Contending with a dead wife in a barrel and Mr. Thompson's comments about the murder was hard enough. I had no desire to add to this by including testimony that Mr. Thompson wore women's clothing and sucked toes. I don't think this testimony would have helped Mr. Thompson's case.

██ An attorney's decision not to pursue certain defenses is a matter of "reasonable professional assessment of the plausibility of the defense and its likelihood of success." *Moreno*, 717 F.2d at 177. Due to the nature of the offense and other evidence in the record, Thompson's attorney was restricted in the types of defenses he could reasonably pursue. Skelton's decision to forego an insanity defense and not to raise a question of Thompson's competency was a matter of trial tactics and strategy. *See McInerney*, 919 F.2d at 353; *Enriquez*, 752 F.2d at 114. Such a decision cannot serve as the basis for federal habeas corpus relief unless it was so ill-chosen that it rendered the entire trial unfair. *See Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; *Green*, 116 F.3d at 1122; *Teague*, 60 F.3d at 1172; *Garland*, 717 F.2d at 206; *Moreno*, 717 F.2d at 177; *Daniels*, 669 F.2d at 1079. No such unfairness has been demonstrated in this situation. Indeed, the avenues suggested by Thompson were not supported by the evidence, and Skelton was not remiss in failing to pursue them. *See Schwander*, 750 F.2d at 499–500; *Murray*, 736 F.2d at 283.

With respect to competency to stand trial, while the record reflects that Skelton was aware that Thompson was hospitalized for mental problems for three weeks following his arrest in January 1993, this was insufficient to provide Skelton notice that an issue of competency to stand trial existed nine months later. The evidence indicates that in the months following Thompson's release from the hospital, he successfully built back up his exterminating business and had rational conversations with a number of the

witnesses at trial. Moreover, without regard to whether Skelton had knowledge of Thompson's experiences in the Navy, his awareness of Thompson's discharge from the Navy for character and behavioral problems in 1975 would have provided an inadequate basis for Skelton to request a competency hearing eighteen years later. Skelton makes it clear in his affidavit that Thompson had full control of his faculties, had no difficulties communicating with him, and never gave any indication that he was suffering from a mental defect. In fact, Thompson's signed statement recounting his thoughts about the case and his interactions with counsel confirms that he demonstrated to Skelton a rational understanding of the proceedings and was able to consult with counsel and assist in the preparation of a defense.

Thompson also cannot rely on his 1995 TDCJ medical records as the basis for arguing that Skelton rendered ineffective assistance at his trial in 1993, as counsel is not expected to be prescient, but can act only on information already in existence that is made known to him. When, as here, counsel has no notice of a present mental impairment, he cannot be faulted for failing to request a competency hearing. "There can be no deficiency for failing to request a competency hearing where there is no evidence of incompetency." *McCoy*, 874 F.2d at 964. Moreover, Thompson cannot show that had counsel requested a hearing, his motion would have been granted or that Thompson would have been found incompetent to stand trial. *See id.* In the circumstances presented here, Skelton made a proper tactical choice not to request a competency hearing. *See Enriquez*, 752 F.2d at 114.

With regard to insanity, to prevail on an insanity defense in Texas, it must be shown that the defendant, at the time of the offense, as a result of severe mental defect or disease, did not know that what he was doing was wrong. The statute provides:

§ 8.01. Insanity

(a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

(b) The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Tex.Pen.Code Ann. § 8.01.

■ "By its nature, the insanity defense involves case by case determinations of fact and will often fail even if raised and even where some indications of irrationality exist." *McInerney*, 919 F.2d at 353. To establish ineffective assistance of counsel for failing to raise an insanity defense, the petitioner must show that his attorney had some indication that mental impairment might prove a promising line of defense. *See Byrne v. Butler*, 845 F.2d 501, 513 (5th Cir.), *cert. denied*, 487 U.S. 1242, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988); *Wilson v. Butler*, 813 F.2d 664, 671 (5th Cir.1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988). It is not enough simply to offer the speculative possibility of a successful insanity plea. *See Long v. Krenke*, 138 F.3d 1160, 1162 (7th Cir.1998).

■ The Supreme Court has held that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that the State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one. *See Ake v. Oklahoma*, 470 U.S. 68, 74, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *Williams v. Collins*, 989 F.2d 841, 844 (5th Cir.1993). Neither "the bare assertion that the defendant was insane at the time of the offense, nor evidence of mental problems generally is sufficient to make the threshold showing required by *Ake*." *Id.* at 845. A defendant satisfies the threshold requirement only when he has made a factual showing sufficient to give the trial court reasonable ground to doubt his sanity at the time of the offense. *See id.*

■ In this instance, a review of the record confirms Skelton's assessment that Thompson knew that his conduct was wrong, thus rendering an insanity defense inapposite. *See McInerney*, 919 F.2d at 353. Not only did Thompson carefully plan the murder and attempt to conceal Betty's death by plac-

ing her body in a barrel and having it buried with toxic wastes, but he tried to rid his house of vestiges of the murder, disposed of the gun, feigned lack of knowledge of Betty's whereabouts after she disappeared, and disclaimed his previous comment to Corbett that he would kill his wife if he could think of a way to get away with it. He also acknowledged to Corbett that his prior comment did not "look good." Because Thompson was obviously aware that murdering his wife was wrong and an insanity defense was thereby foreclosed, there was no reason for Skelton to request a psychiatric evaluation of Thompson. *See Byrne,* 845 F.2d at 513. As the Fifth Circuit noted in *Byrne:*

> The record, therefore, fails to provide any indication that a psychiatric evaluation was warranted. Indeed, overwhelming evidence of the calculated nature of [the petitioner's] crime—a crime planned and committed for pecuniary gain rather than out of passion—belies any such notice.

*Id.; see also Cannon v. Johnson,* 134 F.3d 683, 687 (5th Cir.1998).

Moreover, tactical considerations dictated against raising the issue of insanity. As Skelton points out in his affidavit, pleading insanity would have opened the door to the introduction of damaging evidence of Thompson's deviant sexual practices as well as his use of drugs, evidence that otherwise had been excluded. The Fifth Circuit has recognized that preventing the prosecutor from introducing evidence of other wrongs and offenses committed by the defendant is a legitimate tactical reason for avoiding the introduction of psychological and psychiatric testimony. *See Cannon,* 134 F.3d at 686–87; *Mann v. Scott,* 41 F.3d 968, 983–84 (5th Cir.1994); *cert. denied,* 514 U.S. 1117, 115 S.Ct. 1977, 131 L.Ed.2d 865 (1995); *King v. Puckett,* 1 F.3d 280, 284 (5th Cir.1993). Thus, Skelton's tactical determinations not to raise the issues of incompetency or insanity fall within the wide range of reasonable professional assistance and cannot be deemed deficient under the *Strickland* test. In any event, Thompson "has not satisfied [his] burden under the *Strickland* prejudice prong because the mere possibility of success based on a defense for which there existed little or no evidentiary support is not enough to establish constitutionally inadequate counsel." *Long,* 138 F.3d 1160, 1162 (citing *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052).

### 3. *Failure to Prepare Adequately for Trial*

Finally, Thompson contends that his trial counsel rendered ineffective assistance by failing to prepare adequately for trial. He asserts that his attorney did not file sufficient pretrial motions, specifically, motions *in limine,* motions for discovery, and motions to suppress evidence of items found in Thompson's house.

 A failure by counsel to file motions does not *per se* constitute ineffective assistance of counsel. *See Kimmelman v. Morrison,* 477 U.S. 365, 383–84, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). A determination of ineffectiveness "depends on whether either a suppression motion or an objection would have been granted or sustained had it been made." *United States v. Oakley,* 827 F.2d 1023, 1025 (5th Cir.1987). Moreover, "the filing of pre-trial motions 'falls squarely within the ambit of trial strategy.'" *Schwander,* 750 F.2d at 500 (quoting *Murray,* 736 F.2d at 283).

 With regard to motions *in limine,* a review of the statement of facts reveals that, contrary to Thompson's assertions, motions *in limine* were raised and granted with respect to drug paraphernalia in the Thompson household as well as Thompson's prior conduct involving sex and drugs. When Ricky mentioned drug paraphernalia in his direct testimony, Skelton moved for a mistrial based on the violation of the court's ruling on a motion *in limine.* Although the trial court denied the motion for mistrial, the judge instructed the jury to disregard the witness's answer. Moreover, during Paige's testimony regarding a conversation he had with Thompson, the prosecutor complied with the *in limine* ruling and advised the court that Paige was going to testify that during their conversation, Thompson "told him that he had spent about $32,000 the year before on cocaine." The court excluded the testimony, finding that it was an inadmissible extraneous offense.

With regard to motions for discovery, the prosecutor had an open file policy and allowed defense counsel full access to the file. Thus, it was unnecessary for counsel to file any discovery motions. Skelton explains in his affidavit:

> The State had an "open-file" policy which meant I was able to read the file when and as often as needed. I read the file several times. That is why I knew what the witnesses were prepared to say. There was nothing to discover because I knew everything the State was going to present. I have already discussed extraneous offenses above and the court agreed to exclude Mr. Thompson's sexual past from the jury. There was nothing to suppress because there was noting [sic] taken from Mr. Thompson in violation of the law.

Hence, Skelton cannot be faulted for failing to file motions for discovery or to suppress evidence, as they would have been unavailing. Counsel is not required to file meritless motions or lodge futile objections to render effective assistance. *See Westley v. Johnson*, 83 F.3d 714, 722 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997); *Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir.1995); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.), *cert. denied*, 513 U.S. 966, 115 S.Ct. 432, 130 L.Ed.2d 344 (1994); *McCoy*, 874 F.2d at 963; *Morlett v. Lynaugh*, 851 F.2d 1521, 1525 (5th Cir.1988), *cert. denied*, 489 U.S. 1086, 109 S.Ct. 1546, 103 L.Ed.2d 850 (1989); *Murray*, 736 F.2d at 283. "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark*, 19 F.3d at 966.

Therefore, with respect to his ineffective assistance of counsel claims, Thompson has not shown that his attorney's performance was deficient in any respect. He has failed to adduce sufficient evidence to overcome the strong presumption that his counsel rendered reasonable professional assistance. He, likewise, has failed to show that his attorney's performance prejudiced him or led to an improvident result. Thus, Thompson's ineffective assistance of counsel claims are without merit.

## VI. *Conclusion*

In summary, federal habeas corpus relief is not warranted under any theory advanced by Thompson. The state courts reached the same result, as reflected by the Texas Court of Criminal Appeals' denial of Thompson's state application for a writ of habeas corpus without written order. A denial by the Texas Court of Criminal Appeals of a state habeas application without written order is an adjudication on the merits where, as here, a procedural ground for denying the application does not appear in the state habeas record. *See generally Green*, 116 F.3d at 1121; *Ortega v. McCotter*, 808 F.2d 406, 408 (5th Cir.1987). The federal habeas statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, precludes federal courts from granting habeas corpus relief to state prisoners with respect to any claim that was adjudicated on the merits in a state court proceeding, unless one of two express requirements is satisfied. The statute provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This court, therefore, is bound by the state courts' decisions, as they are neither contrary to nor involve an unreasonable application of clearly established federal law as determined by the Supreme Court, nor are they based on an unreasonable determination of the facts in light of the evidence presented. Thus, the state courts' denial of habeas corpus relief must stand.

Accordingly, Johnson's Motion and Supplemental Motion for Summary Judgment are GRANTED, and Thompson's Petition for

Writ of Habeas Corpus is DENIED. Thompson fails to present a claim that would entitle him to relief. There remain no material fact in dispute, and Johnson is entitled to judgment as a matter of law.

IT IS SO ORDERED.

## FINAL JUDGMENT

On the motions of Gary L. Johnson, Ray Patrick Thompson's petition for a writ of habeas corpus is denied.